# EXHIBIT A

**Declaration of Margaret Iuculano, President, Christian Employers Alliance**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**Jocelyn Samuels**,

*Plaintiff,*

v.

**Donald J. Trump**, et al.,

*Defendants,*

and

**Choices Pregnancy Centers of Greater Phoenix, Inc.**; and **Christian Employers Alliance**, on behalf of its members,

*Proposed Intervenor-Defendants.*

Civil Action No. 1:25-cv-01069-TSC

## Declaration of Margaret Iuculano, President,
## Christian Employers Alliance

I, Margaret Iuculano, declare as follows:

1.    I am over 21 and I am fully competent to make this declaration on personal knowledge.

2.    These facts are true, correct, and within my personal knowledge. If called to testify, I could and would testify competently to them.

## I.    Background on Christian Employers Alliance

1.    I am the President of Christian Employers Alliance (CEA).

2.    CEA is a Christian membership ministry that exists to unite and serve Christian nonprofit and for-profit employers who wish to live out their faith in everyday life, including in their homes, schools, ministries, businesses, and communities.

3.    CEA has many members throughout the United States.

4.    Many employers—including CEA members—recognize that gender-transition efforts and elective abortions harm employees and others. Affirming or facilitating transition efforts or elective abortions ignores the biological realities that humans are male or female and that human life begins at conception.

5.    CEA members place Jesus Christ as the center and foundation of their organizations and are called to live out their faith in every aspect of their operations, including in the workplace.

6.    CEA members sincerely believe that God purposefully designs and creates humans as distinctly either male or female, that His purposeful design and creation of humans as male or female is immutable, that human creation reflects

1

the image and likeness of God, and that males and females are complementary to each other.

7.      CEA members sincerely believe that human life, from the moment of conception to natural death, is sacred. Human life should be honored and protected at all stages of life, and abortion is contrary to honoring and protecting human life.

8.      Most CEA members are engaged in an industry affecting commerce and employ fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year. Thus, most CEA members are "employers" subject to the requirements of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.

### A.    Christian Employers Alliance's Religious Mission

9.      CEA is a membership organization whose mission is to advocate for the rights of its members on issues of religious liberty, the sanctity of life, and the biological and Biblical reality of humans being male and female.

10.     CEA advocates for the freedom of Christian employers seeking to conduct their ministries and businesses according to their religious values. It is part of CEA's mission to represent its members.

11.     CEA's vision is a nation where Christian employers enjoy equal protection of their religious freedom, contribute to a flourishing society, and increase followers of Jesus Christ by living out their faith in the workplace and community.

12.     Membership in the Christian Employers Alliance is open to Christian employers who desire continued freedom to operate their businesses according to biblical principles and to share their faith in the workplace.

13.     CEA defends the freedoms of Christian business owners. CEA's role is to be a watchman and protector to guide the collective impact of Christian business

2

owners. When necessary, CEA's mission includes challenging laws and regulations hostile to religious freedom on behalf of Christian businesses.

14.    CEA has previously had to go to court to protect its rights not to have to provide insurance coverage for abortifacients and for gender-transition services and for its healthcare members not to provide gender-transition services in their healthcare facilities.

15.    CEA also serves as a primary voice of Christian business leaders to Capitol Hill, the media, and the marketplace. CEA speaks uniquely to the issues of conscience, including life, biblical sexual morality, and religious freedom.

16.    Christian CEOs often feel isolated in facing today's cultural and economic challenges. CEA staff thus actively assist in connecting members to one another to leverage information, resources, and solutions. In-person and online gatherings are essential components to our active network.

17.    CEA provides resources to enable members to live out their faith. Through an exclusive online portal, CEA provides access to leading resources, strategies, and innovative solutions for C-Suite leaders to exercise faith in the workplace. CEA also provides members with regular policy and legislative updates regarding challenges and opportunities relevant to Christian employers.

**B.    CEA's Articles of Incorporation and Bylaws**

18.    CEA is a 501(c)(3) nonprofit corporation incorporated in the state of North Dakota.

19.    CEA's officers and employees are Christians.

20.    CEA's Articles of Incorporation state that its purposes are exclusively religious, charitable, and educational. CEA is organized to support Christian employers in responding to changes in civil law that threaten their ability to conduct their affairs consistent with CEA's Christian Values. CEA is organized to

3

make charitable donations to Christian ministries qualifying as religious or charitable organizations.

21.    CEA is a Christian membership ministry that exists to unite and serve Christian nonprofit and for-profit employers who wish to live out their faith in everyday life, including in their homes, schools, ministries, businesses, and communities.

22.    As the Articles of Incorporation show, one of CEA's primary purposes is "[t]o support Christian employers and develop strategies for them, so that they, as part of their religious witness and exercise, may provide health or other employment related benefits to their respective employees and engage in other employment practices in a manner that is consistent with Christian Values."

### C.    CEA's Statement of Faith and Ethical Convictions

23.    CEA is organized to define and state specific Christian ethical convictions as they relate to religious exercise in the workplace.

24.    CEA has a Statement of Faith and Ethical Convictions. This statement is on our website.[1] In relevant part, it reads as follows:

**Section 2. <u>Christian Ethical Convictions</u>.**

The Alliance, its officers, directors, and Members shall subscribe to these Christian Ethical Convictions:

**2.1**    Human life, from the moment of conception to natural death, is sacred. Human life should be honored and protected at all stages of life.

**2.2**    Abortion is the intentional taking of human life or termination of pregnancy at any time from the moment of conception through birth. Abortion is contrary to Christian Values.

…

---

[1] *Statement of Faith and Ethical Convictions*, CEA, https://christianemployers alliance.org/statement-of-faith/, (last visited April 15, 2025).

**2.5**    Male and female are immutable realities defined by biological sex. Gender reassignment is contrary to Christian Values.

…

**2.7**    Unless a Member has exhausted all alternatives that do not create a greater transgression of Christian Values, and such Member has taken all reasonable steps to avoid all such transgressions, a Member cannot—consistent with Christian Values—provide services for, healthcare coverage of, reimbursement for, or access to:

1. Abortions and abortion inducing drugs and devices.

2. Treatments derived from human embryonic stem cells acquired from destruction of a fertilized ovum, or from fetal tissue acquired from an abortion.

3. Assisted suicide.

4. Gender reassignment therapies and surgery.

5. Counseling affirming or encouraging any acts or behavior violating Christian Values, or

6. Any medical treatments, procedures, or medication contrary to Christian Values.

**2.8**    All people have the God-given right to exercise their faith freely, without interference from the government.

**2.9**    Christians are called to exercise their faith in every area of their lives—their homes, schools, ministries, businesses, and communities.

25.    The commitment of CEA members to comply with CEA's Statements of Faith, Christian Values, and Christian Ethical Convictions in their employment practices is part of CEA members' religious witness and religious exercise.

### D.    Christian Employers Alliance's Membership Criteria

26.    To become a member of CEA, prospective members must meet the requirements as set forth in the Bylaws.

27.    CEA is strongly committed to maintaining a high threshold in its membership criteria.

28.    Members must be an employer and must subscribe to CEA's "Christian Values," which are defined in the Bylaws as "the Statement of Faith and Christian

Ethical Convictions … together with such other determinations of faith and values as determined by the Board of Directors."

29.    CEA defines a "Christian" as "[o]ne who lives his or her life according to Christian Values."

30.    Specifically, members must be an "employer[ ] that commit[s] to provide health care benefits consistent with Christian Ethical Convictions and to support the right and freedom of Christian employers to do so."

31.    Nonprofit members must subscribe to the Alliance's Statement of Faith or the Nicene Creed, have a highest executive officer or majority of its governing body that is Christian, and have Section 501(c)(3) status or receive special approval by the President as being nonprofit.

32.    For-profit members must be owned by a 51% majority of Christians and have a 51% majority of Christians on the member's governing body.

33.    All members must subscribe to CEA's Statement of Faith together with such other determinations of faith and values as determined by the Board of Directors, and Christian Ethical Convictions, collectively, the "Christian Values."

34.    All CEA members therefore believe that "[m]ale and female are immutable realities defined by biological sex" and that "[g]ender reassignment is contrary to Christian Values."

35.    As such, CEA members cannot perform, refer for, provide, or otherwise facilitate any form of gender transition services.

36.    Gender transition services would include (but not be limited to) the taking of any medication in attempt to alter one's biological sex (e.g., puberty blockers), surgeries to change the appearance of one's biological sex (e.g., breast removal in a female), counseling affirming one's belief that he or she is a sex different than his or her biological sex, and surgeries to change/remove one's biological reproductive organs (e.g., hysterectomy on a healthy woman).

6

### E.    CEA Membership Processes

37.    CEA maintain the integrity of its membership at the outset of connecting with potential members. CEA continues these efforts throughout the membership relationship.

38.    On CEA's website is a page where new business members may seek membership. This page has a form with our Organizational Membership Agreement Terms and Conditions.[2]

39.    This agreement requires the applicant to confirm:

   a.    The Corporation hereby applies for membership in the Christian Employers Alliance ("CEA").

   b.    For-profit Corporations represent that (I) Christians (or trusts or other entities wholly controlled by Christians) own 51% or more of the Corporation and (II) Christians control a majority of the governance of the Corporation. Nonprofit Corporations represent that Christians control a majority of the governance of the Corporation.

   c.    The Corporation agrees with the CEA Statement of Faith and Ethical Convictions or has adopted creeds or statements of faith (such as the Nicene Creed) that are in harmony and not in conflict with the CEA Statement of Faith and Ethical Convictions.

   d.    If healthcare benefit plans are offered to employees, the Corporation represents that it is committed to providing healthcare benefits consistent with CEA Statement of Faith and

---

[2] *Business Membership Application*, CEA, https://christianemployersalliance.org/cea-member-application/, (last visited April 15, 2025).

Ethical Convictions and to supporting the right and freedom of Christian employers to do so.

    e.    The Corporation agrees to pay dues to the CEA, as determined by the CEA's board of directors.

40.    The applicant is required to check a box saying, "I agree [or I disagree] to each paragraph above, including CEA's Statement of Faith and Ethical Convictions."

41.    An alternate category of membership in CEA is open to Christian affiliate professionals who are not business owners but who desire continued freedom to perform their business services according to biblical principles and to share their faith in the workplace ("AffiliatePro" members).[3] AffiliatePro members likewise must agree to CEA's Christian Values.

42.    On our website for AffiliatePro membership inquiries, we require prospective AffiliatePro members to agree to our Organizational Membership Agreement Terms and Conditions. This form states:

    a.    The AffiliatePro hereby applies for membership in the Christian Employers Alliance ("CEA").

    b.    The AffiliatePro agrees with the CEA Statement of Faith and Ethical Convictions or has adopted creeds or statements of faith (such as the Nicene Creed) that are in harmony and not in conflict with the CEA Statement of Faith and Ethical Convictions.

    c.    The AffiliatePro agrees to pay dues to the CEA, as determined by the CEA's board of directors.

---

[3] *AffiliatePro Membership Application*, CEA, https://christianemployersalliance.org/affiliatepro-application/ (last visited April 15, 2025).

43.     The applicant is required to check a box saying, "I agree [or I disagree] to each paragraph above, including CEA's Statement of Faith and Ethical Convictions."

44.     Upon receiving applications, we conduct our own review and inquiries to confirm that the applicants in fact share our Christian Values.

45.     Under CEA's Bylaws members pay dues, but the bylaws do not specify the amount of dues owed. CEA leadership may adjust the amounts owed for dues based on the needs and purposes of CEA. CEA does not consider any particular dues amount to be an essential criterion for membership, other than the requirement that members pay the dues that CEA requires.

## II.     My Role as President

46.     I submit this declaration on my own behalf as CEA's President and on behalf of CEA as its corporate representative.

47.     I have knowledge of the operations and circumstances of CEA's members with respect to their commitment to operating consistent with the Christian Values of CEA, and to the impact of the agency actions challenged in this case on CEA's members.

48.     I have served as CEA President since December 2024. I set the organization's strategic direction, focusing on policy initiatives, programs, and development efforts that empower Christian business leaders in the political landscape. I drive initiatives that align the business community with our values, ensuring that Christian employers are well-represented and influential in shaping public policy.

49.     My career trajectory began with a foundation in Liberty University's Theology Program.

50.    I have held several executive roles in the private sector, including as the CEO of a tech company. I served as CEO of TechSherpas, a prominent technology company, for eight years. In 2008, I successfully sold the company, marking a high point in my business career.

51.    Building on that success, I transitioned to the nonprofit world, founding a charity focused on advocating for foster children nationwide. Through my published book, *My God Box*, I shared my personal story as a former foster child, championing the causes of vulnerable youth across the country.

52.    Prior to joining CEA, I was the Chief Operations Officer for Moms for America and the Executive Director for MomVote PAC. I also served as the Executive Vice President for FreedomWorks, where I worked with a diverse range of organizations, PACs, and political candidates.

53.    My passion for public service also led me to run for county commission in a major Florida county, where I focused on small business concern and foster care reform. Throughout my career, I have been a dedicated leader for women's leadership with Freedom in Christ Ministries, helping to empower women in their spiritual and professional journeys.

54.    In my role as CEA president, I have been charged by the board of directors to expand and grow our membership while maintaining our Christian Values.

55.    As CEA President, I have frequent interactions with all aspects of the organization. I oversee our operations and membership. I participate in all activities of the CEA board of directors as President. I lead our advocacy in public discourse. I supervise member admission and our staff. During CEA activities, I observe members' statements, members' motivations for their employment practices, members' intent to follow CEA's Christian Values, and members' activities and plans. I ensure that CEA members share and implement CEA positions. If I believe

10

that a person does not share CEA's Christian Values, I do not allow that person to become (or remain) a member. In my experience, our members join CEA because they share CEA's Christian Values.

56.    My duties include supervising and directing CEA staff. CEA has on staff employees in the role of Director of Communications & External Affairs and in the role of Membership Manager. These CEA employees support my work overseeing CEA membership. CEA's prior president also overlapped with me in a transition phase and shared her knowledge of CEA membership practices with me.

57.    Based on my personal interactions with members and staff, as well as CEA internal information systems, I am aware of how the agency actions will impact our members.

## III.    EEOC and its Unlawful Gender-Identity and Abortion Mandates

58.    Defendants Equal Employment Opportunity Commission and its Chair Charlotte Burrows (collectively "EEOC") have sought to impose mandates that affect CEA members.

59.    The EEOC interprets and enforces Title VII's prohibition on discrimination on the "basis of sex" to include discrimination "on the basis of gender identity."

60.    The EEOC applies this interpretation to require "employers" as defined in Title VII to affirm and facilitate gender transitions. This requirement applies to the CEA members that fall under Title VII, which is most members.

61.    CEA submitted a public comment opposing EEOC's harassment guidance.[4] As CEA said, "CEA members are committed to treating people with

---

[4] CEA, Comment Letter on Proposed Enforcement Guidance on Harassment in the Workplace (Feb 21, 2024), https://www.regulations.gov/comment/EEOC-2023-0005-37905.

respect and kindness. That said, they do not believe it is kind or loving to speak, encourage, fund, or engage in actions supporting an inaccurate understanding of gender identity separate and distinct from the biological identity with which an individual is born." For that reason, any "requirement to use a name or pronoun inconsistent with reality and religious conviction or be at risk of 'misgendering' and thus, workplace harassment …. requires speaking a belief against conviction which violates physical reality and the protected speech of the Christian believer."[5]

62.    CEA submitted a public comment opposing the PWFA rule.[6] We expressed our concern that the "proposed rule jeopardizes supportive work cultures for pregnant women by forcing employers to facilitate and promote abortions."

63.    As CEA said in its press release, "The EEOC is seeking to rewrite a recently passed pro-woman, pro-life, and pro-employee law — the Pregnant Workers Fairness Act — to conform to a radical ideological agenda." In fact, "EEOC is attempting to slip abortion … mandates into this law, and thereby negate well-established employer, employee, and religious protections. CEA seeks to shed light on this lawless behavior and requests the EEOC immediately rescind this administrative power grab that hurts women, threatens the unborn children they are carrying, and infringes on religious beliefs."[7]

64.    The agency actions described here impose the following no-win choice on CEA members: (1) abandon or violate their policies and incur the costs of compliance with the agency actions; (2) maintain their positions and practices but

---

[5] *Id.* at 3.

[6] CEA, Comment Letter on Proposed Regulations To Implement the Pregnant Workers Fairness Act (Oct 12, 2023), https://www.regulations.gov/comment/EEOC-2023-0004-97876.

[7] Press Release, CEA, Christian Employers Alliance Calls on EEOC to Rescind Administrative Power Grab via PWFA (Oct. 10, 2023), https://christianemployers alliance.org/wp-content/uploads/2023/10/10.10.23-PWFA-EEOC-Statement.pdf.

risk liability, lawsuits, and investigations; or (3) exit the business world and abandon their customers, investors, and employees.

### A.    The Effect of EEOC's Mandates on Christian Employers Alliance Members' Religious Exercise

65.    This case is about two unlawful mandates that affect CEA members.

66.    *First*, EEOC has improperly applied Title VII of the Civil Rights Act of 1964 to force employers to affirm and accommodate employees' gender-transition efforts (EEOC's Gender-Identity Mandate). This mandate, published in agency "guidance" and on its website, threatens employers with large penalties if they do not use employees' self-selected pronouns based on gender identity, and if they do not allow males to access female single-sex restrooms, locker rooms, and lactation rooms.

67.    *Second*, EEOC issued a final rule that twists the Pregnant Workers Fairness Act (PWFA), Consolidated Appropriations Act of 2023, Public Law 117-328, Div. II, 136 Stat. 4459, 6084–89 (2022) (codified at 42 U.S.C. 2000gg to 2000gg-6), a statute intended to protect pregnant mothers in the workplace, to impose a nationwide abortion mandate forcing employers to promote and facilitate elective abortion. Implementation of the Pregnant Workers Fairness Act, 89 Fed. Reg. 29,096 (Apr. 19, 2024) (the "PWFA Abortion Mandate" or "PWFA Rule"). This rule prevents employers from speaking their pro-life beliefs, requires employers to knowingly give employees special leave, including paid leave, to obtain abortions, and precludes employers from enforcing life-affirming workplace policies against employees who engage in conduct contrary to those policies.

68.    EEOC's actions are collectively called the "EEOC Mandates."

69.    CEA members share one set of common religious objections to the EEOC Mandates.

70.    CEA members recognize the biological reality that humans are male or female, and they recognize the biological reality that abortion ends an unborn life. They hold these views as a matter of Christian beliefs set forth in CEA's Bylaws, which members must accept to become members.

71.    CEA members believe and teach that abortion and gender-transition efforts are wrong, and that they cannot, as a matter of religious conscience and conviction, knowingly or intentionally perform, participate in, pay for, facilitate, enable, or otherwise support abortion or gender transitions.

72.    CEA members are similarly situated to each other, all having the same Christian faith and convictions that oppose affirming or facilitating gender transitions or abortions.

73.    CEA members' current employment practices categorically exclude affirming or facilitating transition efforts or elective abortions.

74.    If CEA members were forced to affirm or facilitate transition efforts or elective abortion, they would violate their religious exercise.

75.    To avoid violating their religious beliefs, CEA members wish to continue to avoid affirming or facilitating transition efforts or elective abortions.

**B.    The need for judicial relief for CEA members**

76.    The EEOC Mandates impose the same burdens on CEA's members and puts them to the same unlawful choices. Compliance with the EEOC mandates would force CEA members to force their employees against their will to perform, refer for, facilitate, speak in favor of, or not speak against, abortion and gender transitions.

77.    If CEA members fail to affirm or facilitate transition efforts or elective abortion, they face severe and devastating legal ramifications. CEA members could incur costly and detrimental civil liability, administrative investigations, possible

14

punitive damages, attorney's fees, and other penalties under Title VII and the PWFA.

78.    Under the EEOC Mandates, CEA members remain compelled to affirm and facilitate gender transition services and abortion under threat of enforcement from the EEOC. CEA members' religious exercise is thus burdened by EEOC's impending threat to enforce its requirement that employers affirm or facilitate gender transition services.

79.    Our members seek to continue to be free to follow CEA's Christian Values in their businesses. Accordingly, they are in need of judicial relief from the harms listed above.

## C.    The effect on representative CEA Members Predictive Fitness and Moms for America

80.    Among CEA members in good standing are representative CEA members Predictive Fitness, Inc., located in Southlake, Texas, and Moms for America, located in Branson, Missouri.

81.    CEA has verified their values, beliefs, and practices, including their intentions and plans to operate their businesses consistent with sharing CEA Christian Values.

82.    Both Predictive Fitness, Inc. and Moms for America affirm the Christian Values set forth in CEA's Bylaws, and operate their organizations consistent with those values, as listed in the Articles of Incorporation and in the Bylaws.

83.    As to the effect of EEOC's Gender-Identity Mandate, both Predictive Fitness, Inc. and Moms for America are representative of all CEA members, and each is similarly situated to our members as a whole.

84.    As to the effect of EEOC's PWFA Abortion Mandate, both Predictive Fitness, Inc. and Moms for America are representative of all CEA members, and

each is similarly situated to our members as a whole, insofar as EEOC's PWFA Abortion Mandate affects employer speech and employer leave policies.

85.    In addition, as to the effect of EEOC's PWFA Abortion Mandate on the ability of mission-oriented organizations to be free not to employ employees who act inconsistent with its pro-life beliefs, Moms for America is representative of the many CEA members who hire for their pro-life missions, and Moms for America is similarly situated to these members.

86.    I know many of these other similarly situated CEA members based on my personal knowledge and our internal records.

87.    Almost all our members have more than fifteen employees and are subject to Title VII.

88.    Both Predictive Fitness, Inc. and Moms for America have more than fifteen employees and are "employers" as defined in Title VII.

89.    Both Predictive Fitness, Inc. and Moms for America are not members of the Catholic Benefits Association or United in Purpose.

90.    Both Predictive Fitness, Inc. and Moms for America have employment policies or practices under which they will not affirm or facilitate gender-transition efforts or elective abortions.

91.    Both Predictive Fitness, Inc. and Moms for America have sincerely held religious beliefs under which they firmly intend that they will not affirm or facilitate gender-transition efforts or elective abortions.

92.    Both Predictive Fitness, Inc. and Moms for America are therefore subject to Title VII's nondiscrimination requirements and are directly affected by the EEOC's actions.

93.    Both Predictive Fitness, Inc. and Moms for America object to having to change their current employment policies and practices, or to alter their speech.

94.     Both Predictive Fitness, Inc. and Moms for America object to having to coerce their employees' speech to comply with the EEOC Mandates.

95.     Both Predictive Fitness, Inc. and Moms for America seek to speak freely and in truth, and both seek to respect employees' freedom to speak freely, so neither can use inaccurate or opposite-sex pronouns or otherwise treat a person as the opposite sex, or require employees to do so.

96.     Both Predictive Fitness, Inc. and Moms for America have a duty to protect the privacy and dignity of all employees, and neither would allow employees to access single-sex spaces of the opposite sex.

97.     Both Predictive Fitness, Inc. and Moms for America want to ensure that they need not use an employee's self-selected pronouns or ensure that employee may access single-sex facilities (like restrooms and locker rooms) based on gender identity.

98.     Both Predictive Fitness, Inc. and Moms for America oppose treating employees as the opposite sex, such as by making exceptions to sex-specific dress codes, so that a male would wear female attire if he identifies as female.

99.     Both entities object to posting posters stating that they comply with the EEOC Mandates.

100.    Both entities want to ensure that they are free to promote pro-life options like adoption without government censorship, and that they need not provide additional on-demand leave above normal allowance for an employee to get an elective abortion.

101.    Both entities support pro-life alternatives to abortion, like adoption.

102.    Both entities object to giving special and extra leave to women above a normal allowance, including paid leave or special time-off privileges, simply to obtain an elective abortion.

17

103.    As a pro-life non-profit advocacy organization, Moms for America requires that individuals serving in leadership roles share and uphold their pro-life values in both belief and conduct. While they recognize that people may have personal histories that differ from their organizational stance, Moms for America seeks to ensure that those in visible or influential positions do not advocate for or justify actions that are inconsistent with their pro-life values. In particular, Moms for America may choose not to employ individuals—especially in leadership—who publicly defend elective abortion as compatible with their values. Doing so would risk undermining the clarity and effectiveness of their mission.

104.    As a result, Moms for America objects to the PWFA Abortion Mandate to the extent that it would prohibit them from considering alignment with their pro-life beliefs when making employment decisions. While they are committed to treating all individuals with dignity and respect, they believe it is essential that their employees—particularly those in leadership—do not publicly support or promote elective abortion in a way that contradicts their mission. Therefore, they seek to maintain the freedom to make employment decisions that reflect and protect the integrity of their pro-life stance.

105.    Both Predictive Fitness, Inc. and Moms for America do not have policies, processes, training, or monitoring programs in place that: (a) require use of an employee's self-selected pronouns, (b) that recognize employees' gender identity instead of sex, (c) that ensure employee access to single-sex facilities (like restrooms and locker rooms) based on gender identity, (d) that limit workplace speech opposing gender-transition efforts, (e) that limit pro-life workplace speech, and (f) that provide additional on-demand leave above normal allowance for an employee to get an elective abortion. In addition, Moms for America does not have policies, processes, training, or monitoring programs in place (g) that would employ a person who acted inconsistently with its pro-life beliefs, especially to employ such

18

a person for a leadership position. Moms for America seeks to be free to decline to employ a person who takes the position that a previous elective abortion they had was justified, or who has or defends having an elective abortion while employed at Moms for America, and Moms for America especially seeks to apply this principle for its leadership positions.

106.    Both entities would need to devote significant time and resources to creating or updating policies, customs, or training programs, and both oppose incurring those financial, logistical, and reputational costs.

107.    Both Predictive Fitness and Moms for America thus face liability from Defendants for exercising their religion by categorically refusing to affirm or facilitate transition efforts or elective abortions.

108.    Both Predictive Fitness, Inc. and Moms for America operate under a credible threat of enforcement—either from the government or from private persons—under Title VII (as interpreted and enforced by Defendants) because of their religiously guided employment practices and policies.

109.    To comply with EEOC's mandates, each business would need to devote significant time and resources to creating or updating policies, customs, or training programs, to reviewing regulations, and to posting new compliance posters. I estimate that it would take each CEA employer several hours of employee time, imposing costs well in excess of $1000 of lost employee value per company. In addition, taking such actions would impose more than financial and logistical costs—it would impose incalculable reputational costs on each CEA member and on CEA itself more broadly, as each CEA member would contradict its Christian mission and risk harming employees. CEA and its members object to incurring these financial, logistical, and reputational costs.

I declare under 28 U.S.C. § 1746 and under penalty of perjury that this declaration is true and correct based on my personal knowledge.

Executed this _15_ day of April 2025 at _10:45_ dn

Margaret Iuculano
President
Christian Employers Alliance

20