**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

JOCELYN SAMUELS,
131 M Street, NE
Washington, D.C. 20507,

*Plaintiff*,

v.                                                    Case No.: 1:25-cv-01069-TSC

DONALD J. TRUMP, in his official capacity as
President of the United States,
1600 Pennsylvania Avenue, NW
Washington, D.C. 20500,

U.S. EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,
131 M Street, NE
Washington, D.C. 20507,

and

ANDREA R. LUCAS, in her official capacity
as Acting Chair of the Equal Employment
Opportunity Commission,
131 M Street, NE
Washington, D.C. 20507,

*Defendants*.

---

**PLAINTIFF JOCELYN SAMUELS'S OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 3

I.    Statutory Background ................................................................................. 3

II.   Factual Background .................................................................................... 9

LEGAL STANDARD........................................................................................ 10

ARGUMENT ..................................................................................................... 11

I.    *Humphrey's Executor* and its progeny remain good law and establish that Congress can limit the President's authority to remove a principal officer of a multi-member independent agency under certain circumstances. ........................................... 12

II.   Congress intended the EEOC to be independent, and protecting the Commissioners from at-will removal promotes the Agency's independence. ..................................... 15

      A.    The structure of the EEOC demonstrates Congress's intent to prohibit at-will removals........................................................................ 17

      B.    The functions of the Commission demonstrate that Congress intended that the Commissioners have protection from at-will removal......................................... 18

III.  Under *Humphrey's Executor* and *Seila Law*, preventing the President from removing EEOC Commissioners at will does not violate the Constitution. ..................................... 22

      A.    The structure of the EEOC supports the constitutionality of for-cause removal protections........................................................................... 23

      B.    EEOC Commissioners do not exercise substantial executive power.................... 24

      C.    The Government's remaining constitutional arguments are unavailing. .............. 34

IV.   Plaintiff can bring an *ultra vires* cause of action. ............................................ 35

CONCLUSION................................................................................................... 37

# TABLE OF AUTHORITIES

**<u>Cases</u>**

*Ashcroft v. Iqbal*
       556 U.S. 662 (2009) ......................................................................................... 10

*Bell Atl. Corp. v. Twombly*
       550 U.S. 544 (2007) ......................................................................................... 10

*Boyle v. Trump*
       No. CV MJM-25-1628, 2025 WL 1677099 (D. Md. June 13, 2025) ........................ 2, 36

*City of Arlington, Texas v. F.C.C.*
       569 U.S. 290 (2013) ......................................................................................... 34

*Collins v. Yellen*
       594 U.S. 220 (2021) ................................................................................... 13, 33

*E.E.O.C. v. St. Francis Xavier Parochial Sch.*
       117 F.3d 621 (D.C. Cir. 1997) ........................................................................... 11

*E.E.O.C. v. Shell Oil*
       466 U.S. 54 (1984) ........................................................................................... 27

*F.E.C. v. NRA Pol. Victory Fund*
       6 F.3d 821 (D.C. Cir. 1993) .............................................................................. 16

*Ford Motor Co. v. E.E.O.C.*
       458 U.S. 219 (1982) ......................................................................................... 28

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*
       561 U.S. 477 (2010) ................................................................................... 13, 16

*\*Grundmann v. Trump*
       770 F. Supp. 3d 166 (D.D.C. 2025) ............................................................. *passim*

*\*Harper v. Bessent*
       No. 25-01294 (AHA), 2025 WL 2049207 (D.D.C. July 22, 2025) ..................... *passim*

*Harris v. Bessent
    775 F. Supp. 3d 86 (D.D.C. 2025) ............................................................... 31

*Harris v. Bessent
    775 F. Supp. 3d 164 (D.D.C. 2025) ............................................................... 2

*Harris v. Bessent
    No. 25-5037, 2025 WL 980278 (D.C. Cir. Mar. 28, 2025)................................... 26, 31

Hopkins v. Price Waterhouse
    920 F.2d 967 (D.C. Cir. 1990)....................................................................... 24

*Humphrey's Executor v. United States,
    295 U.S. 602 (1935)........................................................................ passim

Jarkesy v. S.E.C.
    34 F.4th 446 (5th Cir. 2022)......................................................................... 16

Kennedy v. Braidwood Management, Inc.
    145 S. Ct. 2427 (2025)....................................................................... 20, 21, 22

LeBlanc v. Priv. and C.L. Oversight Board
    No. 25-542 (RBW), 2025 WL 1454010 (D.D.C. May 21, 2025) ............................ 2, 22

Mach Mining, LLC v. E.E.O.C.
    575 U.S. 480 (U.S. 2015)............................................................................. 28

Morrison v. Olson
    487 U.S. 654, 687 n. 25 (1988)................................................................. 13, 32

Nuclear Regulatory Commission v. Texas
    145 S. Ct. 1762 (2025)........................................................................... 35, 36

*Seila Law v. Consumer Financial Protection Bureau
    591 U.S. 197 (2020)...................................................................... passim

*Severino v. Biden
    71 F.4th 1038 (D.C. Cir. 2023) ......................................................... passim

*Slaughter v. Trump*
      No. 25 - 909 (LLA), 2025 WL 1984396 (D.D.C., July 17, 2025) ............................ 2, 29

*Sparrow v. United Air Lines, Inc.*
      216 F.3d 1111 (D.C. Cir. 2000) ...................................................................................11

*Trump v. Boyle*
      No. 25A11, slip op. (U.S. July 23, 2025)................................................................... 15

*Trump v. Wilcox*
      145 S. Ct. 1415 (2025) ....................................................................... 1, 14, 15, 25

*\*Wiener v. United States*
      357 U.S. 349 (1958) ......................................................................................... *passim*

*\*Wilcox v. Trump*
      775 F. Supp. 3d 215 (D.D.C. 2025) ........................................................ 2, 30, 35, 36

## **Statutes**

12 U.S.C. § 248(p) .............................................................................................................. 31

15 U.S.C. § 77t(b) .............................................................................................................. 31

15 U.S.C. § 77t(c) .............................................................................................................. 31

15 U.S.C. § 78u(c) .............................................................................................................. 31

15 U.S.C. § 78u(d) .............................................................................................................. 31

15 U.S.C. § 78u(e) .............................................................................................................. 31

2 U.S.C. § 288c .............................................................................................................. 31

2 U.S.C. § 5571(a) .............................................................................................................. 32

29 U.S.C. § 206(d) ............................................................................................................... 7

29 U.S.C. § 626 ................................................................................................................... 7

29 U.S.C. § 628 ........................................................................................................... 31, 32

29 U.S.C. § 791 ................................................................................................................ 7

42 U.S.C. § 12116 ...................................................................................................... 31, 32

42 U.S.C. § 12117(a) ....................................................................................................... 7

42 U.S.C. § 2000a ........................................................................................................... 4

42 U.S.C. § 2000e-12(a) ............................................................................................... 32

42 U.S.C. § 2000e-14 .................................................................................................... 34

42 U.S.C. § 2000e-16(c) ........................................................................................... 7, 26

42 U.S.C. § 2000e-4(a) ......................................................................................... 4, 17, 24

42 U.S.C. § 2000e-4(b) ............................................................................................. 6, 29

42 U.S.C. § 2000e-4(b)(1) ........................................................................................ 8, 27

42 U.S.C. § 2000e-4(c) ................................................................................................... 5

42 U.S.C. § 2000e-4(e) ............................................................................................. 5, 32

42 U.S.C. § 2000e-4(g) ................................................................................................... 5

42 U.S.C. § 2000e-5 ....................................................................................................... 5

42 U.S.C. § 2000e-5(f) ................................................................................................... 6

42 U.S.C. § 2000e-5(f)(1) .............................................................................................. 8

42 U.S.C. § 2000e-6 ....................................................................................................... 5

42 U.S.C. § 2000e-6(c) ................................................................................................... 6

42 U.S.C. § 2000ff ......................................................................................................... 7

42 U.S.C. § 2000gg ........................................................................................................ 8

42 U.S.C. § 2000gg-3(a) ...................................................................................... 31, 32

42 U.S.C. § 280g-10(a) ........................................................................................... 20

42 U.S.C. § 299b-4(a)(1) ........................................................................................ 21

42 U.S.C. § 2000e-5(b) ...................................................................................... 27, 28

5 U.S.C. § 595(b) .................................................................................................... 18

**<u>Other Authorities</u>**

*2024 Annual Performance Report*
    EEOC (Jan. 17, 2025), https://perma.cc/Q3RM-4JPM ....................................... 28

*Data and Analytics – Overview*
    EEOC, https://perma.cc/LLK3-VZZQ .................................................................. 30

*EEOC Moves to Drop Transgender Discrimination Cases to Comply with Trump's Order*
    PBS News (Feb. 15, 2025, 7:04 PM), https://perma.cc/V3EC-ZXLD .......................... 29, 30

*EEOC Organizational Structure, EEOC 2024 Annual Performance Report*
    EEOC, https://perma.cc/LR24-JNVK .................................................................... 9

*EEOC Publishes Annual Performance and General Counsel Reports for Fiscal Year 2024*
    EEOC (Jan. 17, 2025), https://perma.cc/83UZ-XSDX .................................... 8, 27

Matthew Goldstein & Emily Steel, *Trump Fired E.E.O.C. Commissioners in Late-Night Purge*
    N.Y. Times (Jan. 28, 2025), https://perma.cc/HK4E-UCCK ................................. 9

*Standards and Procedures for Settlement of EEOC Litigation*
    EEOC (May 21, 2024), https://perma.cc/X3N2-T9K6 ........................................ 27

**<u>Regulations</u>**

29 C.F.R. § 1601.15 ................................................................................................ 27

29 C.F.R. § 1601.16 ................................................................................................ 27

29 C.F.R. § 1601.17 ................................................................................................ 27

29 C.F.R. § 1601.19 ................................................................................................ 27

29 C.F.R. § 1601.20 ................................................................................................ 27

29 C.F.R. § 1614.110 .............................................................................................. 7

29 C.F.R. § 1614.401 .............................................................................................. 7

29 C.F.R. § 1614.404 .............................................................................................. 7

29 C.F.R. § 1614.405 .............................................................................................. 7

29 C.F.R. § 1614.501 .............................................................................................. 7

29 C.F.R. pt. 1625 .................................................................................................. 31

29 C.F.R. pt. 1626 .................................................................................................. 31

29 C.F.R. pt. 1627 .................................................................................................. 31

29 C.F.R. pt. 1630 .................................................................................................. 31

29 C.F.R. pt. 1636 .................................................................................................. 31

Reorganization Plan No. 1 of 1978, 43 Fed Reg. 198070, *reprinted in* 92 Stat. 378 .................... 7

**Constitutional Provisions**

U.S. Constitution, Article II, Section 2, Clause 2 ....................................................... 12

**Legislative Materials**

Civil Rights Act of 1964
     Pub. L. No. 88-352, 78 Stat. 241 (1964) .................................................... 4, 24

Equal Employment Opportunities Act of 1972
     Pub. L. No. 92-261, 86 Stat. 103 (1972) .................................................... 5, 7

Special Message to the Congress on Civil Rights and Job Opportunities
     Pub. Papers 483 (June 19, 1963) ................................................................. 4

S. Rep. No. 415, 92d Cong., 1st Sess. 18 (1971) ...................................................... 24

S. Rep. No. 92-415 (1971) ................................................................................. 4

118 Cong. Rec. 579 (Jan. 20, 1972) ................................................................. 6

**<u>Executive Orders</u>**

Ending Illegal Discrimination and Restoring Merit-Based Opportunity,
   Exec. Order No. 14, 173, 90 Fed. Reg. 8633 (2025) ....................................... 10

Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the
   Federal Government
   Exec. Order. No. 14, 168, 90 Fed. Reg. 8615 (2025) ...................................... 10

Ending Radical and Wasteful Government DEI Programs and Preferencing
   Exec. Order No. 14, 151, 90 Fed. Reg. 8339 (2025) ....................................... 10

## INTRODUCTION

In 1935, the Supreme Court unanimously held in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), that Congress can limit the president's authority to remove a principal officer, and dictate that such removals be done only for inefficiency, neglect of duty, or malfeasance in office, when that officer is part of a multimember, bipartisan independent agency whose Commissioners have staggered terms and whose functions are predominantly quasi-legislative and quasi-judicial, as opposed to executive. Two decades later, in *Wiener v. United States*, 357 U.S. 349 (1958), the Supreme Court unanimously applied the reasoning in *Humphrey's Executor* to find that the president did not have at-will authority to remove a member of the War Claims Commission, a multimember, quasi-judicial body. The Court found that even though the governing statute did not explicitly provide for restrictions on removal, such restrictions could be inferred from the structure and functions of the Commission. These cases, and the more recent Supreme Court decisions in *Seila Law v. Consumer Financial Protection Bureau*, 591 U.S. 197 (2020), and *Trump v. Wilcox*, 145 S. Ct. 1415 (2025), recognize that Congressional limitations on the president's removal of principal officers who are leaders in multimember independent agencies do not contravene the president's executive authority under Article II of the Constitution provided that those officers are not exercising substantial executive power. Under such circumstances, the Congressional limitations do not implicate the constitutional concern that the president lacks sufficient control over executive functions performed at those independent agencies.

Following *Humphrey's Executor*, Congress has created numerous independent agencies where commissioners perform largely quasi-judicial and/or quasi-legislative functions. The executive functions in those agencies are primarily performed by their chairs, who are designated by the president, or other presidentially-appointed officers like general counsels. With rare

exceptions, prior presidents have respected statutory limitations on their ability to remove the Senate-confirmed leaders of multimember independent agencies.

This has changed dramatically in the second Trump Administration. The President has removed numerous members who are part of multimember independent agencies, either without providing a reason or for reasons that do not conform to the holding of *Humphrey's Executor* or subsequent cases such as *Wiener*. The President's actions stand to eviscerate the functioning of agencies for which Congress determined independence was essential. Several of these leaders have challenged these removals and obtained summary judgments in their favor. *See Harris v. Bessent,* 775 F. Supp. 3d 164 (D.D.C. 2025); *Wilcox v. Trump*, 775 F. Supp. 3d 215 (D.D.C. 2025); *Grundmann v. Trump*, 770 F. Supp. 3d 166 (D.D.C. 2025); *LeBlanc v. Priv. and C.L. Oversight Board*, No. 25-542 (RBW), 2025 WL 1454010 (D.D.C. May 21, 2025); *Boyle v. Trump*, No. CV MJM-25-1628, 2025 WL 1677099 (D. Md. June 13, 2025); *Slaughter v. Trump*, No. 25 - 909 (LLA), 2025 WL 1984396 (D.D.C., July 17, 2025); *Harper v. Bessent*, No. 25-01294 (AHA), 2025 WL 2049207 (D.D.C. July 22, 2025). These cases are now pending in the circuit courts of appeal.

Plaintiff Jocelyn Samuels, a Commissioner of the Equal Employment Opportunity Commission ("EEOC" or "Commission" or "the Agency"), is one of those principal officers on a multimember commission whom President Trump has removed without cause. And like others, she has sued to challenge her removal. Congress created the EEOC in Title VII of the Civil Rights of 1964 to address the widespread scourge of discrimination in employment. Consistent with *Humphrey's Executor* and *Wiener*, the Commission's structure and functions reflect Congress's intent that an EEOC Commissioner can be removed only for cause.

In its Memorandum supporting its motion to dismiss ("Brief"), ECF No. 24-1, the Government makes three primary arguments supporting dismissal of Plaintiff's claim: (1) because

there is no explicit removal protection for Commissioners in Title VII, there are no limitations on removal; (2) even if there were a limitation on removal, it would be unconstitutional because the EEOC exercises substantial executive power; and (3) Plaintiff cannot bring an *ultra vires* cause of action. This Court should reject all three arguments and allow Commissioner Samuels's case to proceed.

First, as in *Wiener*, Congress's intent to limit the president's removal authority and to provide EEOC Commissioners with independence can be inferred from the structure and functions of the Agency and the Commissioners, particularly from the Commission's role adjudicating federal sector employment discrimination claims. Second, the *Commissioners'* functions are primarily quasi-legislative and quasi-judicial; the *Agency's* scant executive functions are performed primarily by the Chair of the Commission and its General Counsel, both of whom the President selects. The Government's Brief ignores the critical distinction between functions performed by the Agency writ large and those performed by the Commissioners. Moreover, the Government's brief mischaracterizes quasi-legislative and quasi-judicial functions as exercises of executive power. Third, the primary case upon which the Government relies in asserting that Plaintiff cannot bring an *ultra vires* claim does not apply in the independent agency leader removal context, and in fact, courts have granted summary judgment in multiple removal cases this year based on *ultra vires* causes of action.

For these reasons and as detailed below, the Court should deny the Government's Motion.

## BACKGROUND

### I.    Statutory Background

Congress created the EEOC within Title VII of its landmark legislation, the Civil Rights Act of 1964 ("the CRA"). The civil rights movement and the violent backlash to it inspired

President Kennedy to introduce a civil rights bill in February of 1963. Though the original bill did not address employment discrimination, President Kennedy made the case for its inclusion when he addressed Congress in June of 1963: "[R]acial discrimination in employment must be eliminated. Denial of the right to work is unfair, regardless of its victim. It is doubly unfair to throw its burden on an individual because of his race or color." Special Message to the Congress on Civil Rights and Job Opportunities, 1 PUB. PAPERS 483 (June 19, 1963). In response, Congress added provisions barring employment discrimination on specified bases to the proposed civil rights legislation. Pub. L. No. 88-352, 78 Stat. 241 (1964); 42 U.S.C. §§ 2000a *et seq.* As Congress later stated:

> In response to compelling national need and concern, Congress enacted Title VII of the Civil Rights Act of 1964 (Public Law 88-352). By its action, Congress acknowledged the prevalence of employment discrimination in the United States and the need for federal legislation to deal with the problem of such discrimination. The Act also established the Equal Employment Opportunity Commission ("EEOC") . . . . It was the intention of Congress that the EEOC should be the primary Federal agency responsible for eliminating discriminatory employment practices in the United States.

S. Rep. No. 92-415 at 3 (1971). Though the CRA was omnibus civil rights legislation that addressed numerous issues, the only independent agency the CRA created was the EEOC.

Congress structured the Commission with five members appointed by the president with the advice and consent of the Senate. 42 U.S.C. § 2000e-4(a). No more than three members can be from the same political party. *Id.* The members have five-year staggered terms such that one member's term ends each year, ensuring that the sitting president regularly has opportunities to appoint members of the Commission. *Id.* In the event of a vacancy, a replacement is appointed only for the remainder of the original term. *Id.* The president designates one member to serve as the Chair of the Commission. *Id.* There are no statutory restrictions on the president's selection of the Chair; there is no term of service set for a person's tenure as Chair, there is no additional

confirmation process once an incumbent Commissioner is selected as Chair, and incoming Presidents often select a member from their party to fill this role.  The Chair is responsible for the administrative operations of the Commission, including appointing any officers, agents, attorneys, and employees deemed necessary and determining their compensation.  *Id.*  Title VII requires a quorum of three members.  *Id.* § 2000e-4(c).

Title VII provides that the Commission reports to Congress and the president every year on the operations and activities of the Agency and makes "reports on the cause of and means of eliminating discrimination and such recommendations for further legislation as appears desirable." *Id.* § 2000e-4(e).  The Commission has other duties, including the authority to make technical studies and to engage in educational and promotional activities.  *Id.* § 2000e-4(g). Additionally, the Act creates an administrative charge process that persons alleging discrimination under Title VII must follow in advance of filing civil litigation.  As set forth in the Act, the process begins with a person filing a charge with the EEOC.  The Commission then investigates the charge and seeks to resolve the matter, and, if the matter is not resolved, informs the aggrieved party that they can bring a civil action.  *Id.* § 2000e-5.  Under its originating statute, the Agency could not bring civil actions, although the Attorney General could bring suit to challenge employers engaged in a "pattern or practice" of discrimination.  *Id*. § 2000e-6.

In the decades since Congress passed Title VII, the EEOC's functions and operations have evolved.  This began with the enactment of the Equal Employment Opportunities Act of 1972 (EEOA).  Equal Employment Opportunities Act of 1972, Pub. L. No. 92-261, 86 Stat. 103 (1972). During its deliberations that led to enactment of the EEOA, Congress recognized that "the Equal Employment Opportunity Commission is the expert agency in the field of employment discrimination" and that it was an "independent agency."  H.R. Rep. No. 92-238, at 25 (1971).

Under the EEOA, Congress empowered the Commission to litigate matters resulting from charges in which the Agency finds cause and is unable to resolve the claim through conciliation or mediation.  42 U.S.C. § 2000e-5(f); 42 U.S.C. § 2000e-6(c) (transferring "pattern or practice" authority to the Commission).  Concurrently with the creation of this litigating authority, Congress established the position of General Counsel and stated that that official "shall have responsibility for the conduct of litigation." *Id.* § 2000e-4(b).  Like the Commissioners, the General Counsel is appointed by the President with the advice and consent of the Senate. *Id.*

When the Senate originally introduced the amendment to Title VII to add the General Counsel provisions to the bill that would become the EEOA , 118 Cong. Rec. 579 (Jan. 20, 1972), Congress did so to keep the prosecutorial (General Counsel) and decisional (Commission) functions separate from one another, as indicated by the statement from Senator Harrison Williams of New Jersey: "This amendment calls for the establishment of a General Counsel's Office of the Equal Employment Opportunity Commission, which though a part of the Commission and empowered to act in its name, is to be independent of its control.  The purpose of the amendment is to ensure that the prosecutorial and decisional functions of the Commission will be firmly separated and to eliminate any lingering notion that the Commission would be involved in a conflict of acting as prosecutor and judge."  118 Cong. Rec. 583 (Jan. 20, 1972) (statement of Senator Williams).  For similar reasons, the amendment gave the president appointment authority over the General Counsel as opposed to the Commission: "The appointment of the General Counsel by the President guarantees that he will not be the pawn of the Commission in carrying out his prosecutorial responsibilities." *Id.*

Also, as part of the EEOA, Congress extended coverage of Title VII to employees of the federal government and gave the Civil Service Commission responsibility for adjudicating federal

claims of discrimination.  Pub L. No. 92-261 § 11, 86 Stat. 103 (1972).  That adjudicative authority was transferred to the EEOC by Reorganization Plan No. 1 of 1978, 43 Fed. Reg. 198070, *reprinted in* 92 Stat. 3781.  Procedurally, employees must exhaust a process within their agency.  A claimant can choose to have their agency issue a final decision or retain the right to bring their claim before an administrative judge employed by the EEOC.  Those administrative judges then hold hearings and issue decisions that can be adopted or rejected by the employing agency.  29 C.F.R § 1614.110. If the employing agency rejects a determination favorable to an employee, the employee has the right to appeal to the Commission, which can either affirm or reverse that decision.  *Id*. §§ 1614.401, 404, 405.  If the employing agency is found liable, the Commission orders appropriate relief, although it lacks the power to enforce compliance with its order.  *Id.* § 1614.501. If the Commission rules against the employee, or if an agency does not comply with the Commission's order, the employee can file a civil action against the agency.  42 U.S.C. § 2000e-16(c).

Over the ensuing decades, the EEOC's mission expanded to include eradication of employment discrimination on the basis of age, 29 U.S.C. § 626 (enforcement of the Age Discrimination in Employment Act (ADEA) transferred from the Department of Labor to the EEOC by Reorganization Plan No. 1 of 1978, 43 Fed. Reg. 198070); sex discrimination in pay (enforcement of the Equal Pay Act  (EPA) of 1963, 29 U.S.C. § 206(d), transferred from the Department of Labor to the EEOC by Reorganization Plan No. 1 of 1978, 43 Fed. Reg. 198070); disability, 29 U.S.C. § 791 (Rehabilitation Act of 1973 applicable to federal employees), (42 U.S.C. § 12117(a) (incorporating the powers, procedures, and remedies of Title VII into the Americans with Disabilities Act (ADA) of 1990); genetic characteristics, 42 U.S.C. § 2000ff (Genetic Discrimination in Employment Act (GINA) of 2008); and accommodation of pregnancy,

42 U.S.C. § 2000gg (Pregnant Worker Fairness Act (PWFA) of 2023). Title VII itself has been amended on several occasions in response to Supreme Court decisions limiting the scope of the statute. The EEOC's processes and methods of handling discrimination complaints are largely similar under each statute included in its jurisdiction.

Implementing the charge process for discrimination complaints is one of the Agency's core functions. In practice, the EEOC's functions with respect to discrimination complaints from covered employees in the private sector entail receiving a "charge," or complaint of discrimination; notifying the respondent (employer, labor union, or employment agency) of the charge; offering free and voluntary mediation; conducting an investigation of the aggrieved individual's allegations; making a determination whether there is cause to believe the respondent has violated the law; if not, issuing a right to sue notice to the individual; if there is cause, attempting to persuade the respondent to reach a voluntary agreement to come into compliance with the law; and, if that fails, issuing a notice of right to sue to the individual who can then seek a remedy in court. 42 U.S.C. §§ 2000e-5(b), (f)(1). In a very small percentage of cases in which it has found cause, the EEOC files suit in federal court to seek statutory remedies from Article III judges for violations of the anti-discrimination statutes. *Id.* § 2000e-5(f)(1). EEOC's Fiscal Year 2024 statistics show 88,531 charges received and 111 merits lawsuits filed. *EEOC Publishes Annual Performance and General Counsel Reports for Fiscal Year 2024*, EEOC (Jan. 17, 2025), https://perma.cc/83UZ-XSDX. As stated above, the General Counsel has statutory responsibility for conducting the litigation. 42 U.S.C. § 2000e-4(b)(1).

The EEOC has described its leadership structure as follows:

> The EEOC leadership consists of the Chair, Vice Chair, three Commissioners, and the General Counsel who each have independent authority and do not report to anyone else at the EEOC. The EEOC accomplishes its mission through component offices with varied reporting structures. Most of the Offices report to the Chair,

> specifically the Executive Secretariat; RESOLVE; the Office for Civil Rights; the Office of Communications and Legislative Affairs; the Office of the Chief Financial Officer; the Office of Information Technology; the Office of Enterprise Data and Analytics; the Office of the Chief Human Capital Officer; the Office of Legal Counsel; the Office of Federal Operations; and the Office of Field Programs. The EEOC's 53 District, Field, Area, and Local Offices report to the Office of Field Programs. The Office of General Counsel reports to the General Counsel and the Field Office Legal Divisions report to the Office of General Counsel; however, the Chair retains operational authority over those offices. Lastly, the Office of Inspector General is independent and does not report to any other office.

*EEOC Organizational Structure, EEOC 2024 Annual Performance Report*, EEOC, https://perma.cc/LR24-JNVK. Consistent with Title VII, 42 U.S.C. § 2000e-4, the structure reflects that the General Counsel is independent from the Commissioners, that almost all agency personnel report to the Chair or the General Counsel, and that no other component offices report to the other Commissioners.

## II.    Factual Background

The Senate confirmed Plaintiff Jocelyn Samuels as a Commissioner of the EEOC on July 14, 2021, for a second term of five years. Pl.'s Compl. for Declaratory & Injunctive Relief ("Compl.") ¶ 26, ECF No. 3. On January 27, 2025, President Trump purported to remove Commissioner Samuels, without cause, more than a year and a half before her term was set to expire. *Id.* ¶¶ 26, 35–38. The same email that purported to remove Commissioner Samuels also purported to remove Commissioner Charlotte Burrows, one of the other Democratic Commissioners serving on the Commission. *Id.* ¶ 40. General Counsel Karla Gilbride was removed in the same email. Matthew Goldstein & Emily Steel, *Trump Fired E.E.O.C. Commissioners in Late-Night Purge*, N.Y. TIMES (Jan. 28, 2025), https://perma.cc/HK4E-UCCK. By removing Commissioners Samuels and Burrows, President Trump eliminated the EEOC's quorum, halting any EEOC activity that requires a Commission vote. Compl. ¶ 6.

The President's removal of Commissioner Samuels is unprecedented. It is the first time in the EEOC's 61-year history that a president has sought to remove a Commissioner before the expiration of their term. *Id.* ¶ 5. The President did not identify any neglect of duty or malfeasance by Commissioner Samuels to justify such a departure and instead cited his power under Article II and the lack of explicit removal language in Title VII. *Id.* ¶ 37. The only justification offered for Commissioner Samuels's purported removal was her alleged efforts "to impose an expansive and improper DEI agenda on America's workplaces," her role in "enacting or enforcing the Biden Administration's radical Title VII guidance," and her commitment to "furthering a series of race-based initiatives that are themselves mired in racism." *Id.* ¶ 37. The removal email also referred to a statement from Commissioner Samuels and two of her fellow Commissioners that criticized Defendant Trump's Executive Orders: Ending Radical and Wasteful Government DEI Programs and Preferencing, Exec. Order No. 14, 151, 90 Fed. Reg. 8339 (2025); Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, Exec. Order. No. 14, 168, 90 Fed. Reg. 8615 (2025); and Ending Illegal Discrimination and Restoring Merit-Based Opportunity, Exec. Order No. 14, 173, 90 Fed. Reg. 8633 (2025). *Id.* ¶¶ 28–34, 37–38.

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual allegations to "state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), meaning "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must treat the plaintiff's "factual allegations as true and must grant [the] plaintiff the benefit of all inferences that

can be derived from the facts alleged." *Sparrow v. United Air Lines, Inc*., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal citation and quotation omitted).  In deciding a Rule 12(b)(6) motion, the Court may consider "any documents either attached to or incorporated in the complaint and matters of which [the Court] may take judicial notice." *E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

## ARGUMENT

Almost a century ago, in *Humphrey's Executor*, 295 U.S. 602, the Supreme Court unanimously upheld the constitutionality of Congress's limitations on the president's authority to remove a principal of an independent agency.  The Government argues the "*Humphrey's Executor* exception" does not apply here for two principal reasons: (1) the lack of explicit removal language in Title VII demonstrates that Congress did not intend to limit the President's removal power; and (2) even if Congress did intend to limit the President's removal authority, the *Humphrey's Executor* exception does not apply because EEOC Commissioners exercise "substantial" executive authority.  As detailed below, these arguments are unavailing.  First, as discussed by the Supreme Court in *Wiener*, 357 U.S. 348, and the D.C. Circuit in *Severino v. Biden*, 71 F.4th 1038 (D.C. Cir. 2023), a removal limitation can be inferred absent an explicit provision when it follows from the statutory structure and function of the agency, as here.  Second, the statutory framework and the operation of the agency demonstrate that the EEOC Commissioners, outside of the Chair, do not exercise substantial executive authority.

Additionally, the Government claims that an *ultra vires* cause of action is not permitted.  But the recent Supreme Court decision that serves as the foundation for the Government's argument is not applicable in this context.  Moreover, as courts have granted summary judgment

in several recent cases involving removal claims based on an *ultra vires* cause of action, such a claim is viable and cannot serve as the basis for granting a motion to dismiss.

I.     ***Humphrey's Executor* and its progeny remain good law and establish that Congress can limit the President's authority to remove a principal officer of a multi-member independent agency under certain circumstances.**

The Appointments Clause of the U.S. Constitution, Article II, Section 2, Clause 2, sets forth a process in which the president nominates and the Senate confirms Officers of the United States.   The Clause does not explicitly provide for removal of officers, but in *Humphrey's Executor*, the Supreme Court addressed the issue of whether the President could remove a principal officer of a bipartisan, multimember agency without cause in spite of Congressional intent to the contrary. The Court held that it was constitutional for Congress to limit the president's removal power and that the president did not have the authority to fire an agency principal officer absent cause under the circumstances presented.  *Humphrey's Ex'r*, 295 U.S. at 622.

William Humphrey was a member of the Federal Trade Commission (FTC) nominated by President Hoover and confirmed by the Senate for a term ending in 1938.   When Franklin Roosevelt became president, he decided to remove Humphrey because of their differing views.  *Id.* at 618–19.   President Roosevelt subsequently requested Humphrey's resignation.  *Id.* at 617–18. When Humphrey refused, President Roosevelt wrote him, "Effective as of [October 7, 1933,] you are hereby removed from the office of Commissioner of the Federal Trade Commission."  *Id.* at 619.  Humphrey filed suit.

The statute creating the FTC limited the President's removal power to instances of "inefficiency, neglect of duty, or malfeasance in office," and the government did not dispute that the difference in views between Humphrey and the President failed to satisfy that standard. Instead, the government contended that Congress's limitations on removal violated Article II of the Constitution.   Congress constructed the agency such that the Commissioners were a bipartisan

group of experts who served staggered, fixed, terms and whose "duties [were] neither political nor executive, but predominantly quasi judicial and quasi legislative." *Id.* at 624. The Court found that the limitation on removal was constitutional given that the FTC was "created by Congress as a means of carrying into operation legislative and judicial powers, and as an agency of the legislative and judicial departments." *Id.* at 630. The Court referred to the FTC as a "legislative" and "judicial aid." *Id.* at 628.

The Supreme Court has repeatedly reaffirmed the holding in *Humphrey's Executor*. *See Wiener*, 357 U.S. at 356 (applying *Humphrey's Executor* in holding that the President illegally removed members of the War Crimes Commission); *Morrison v. Olson*, 487 U.S. 654, 687 n. 25, 688 (1988) (recognizing that *Humphrey's Executor* is still good law); *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 483 (2010) (declining to "reexamine" *Humphrey's Executor*); *Seila Law*, 591 U.S. at 204, 228 (expressly stating twice that it was not revisiting *Humphrey's Executor*); *Collins v. Yellen*, 594 U.S. 220, 251 (2021) (same).

Two of these subsequent decisions and a Supreme Court stay order from earlier this year are particularly noteworthy. In *Wiener*, the Supreme Court applied *Humphrey's Executor* to unanimously hold that President Eisenhower's removal without cause of a member of the War Claims Commission was illegal. As part of the War Claims Act of 1948, Congress created the three-member War Claims Commission to adjudicate claims of those who suffered personal injury or property damage from enemies during World War II. The statute set a term for the Commissioners, but there was no explicit language on removal. 357 U.S. at 350. President Eisenhower removed Commissioner Myron Wiener because he regarded it in "the national interest" for the work of the Commission to be completed with "personnel of [his] own selection." *Id.* Acknowledging that the case was a variant on *Humphrey's Executor*, *id.* at 352, the Court found that Congress—despite the absence of express protections

13

against removal—intended to impose limits on the President's removal authority because of the adjudicatory function of the Commission. *Id.* at 353–55. The Court further found that such implied limitations on the President's removal authority were constitutional because the Commission's function was adjudicatory and not executive:

> Judging the matter in all the nakedness in which it is presented, namely, the claim that the President could remove a member of an adjudicatory body like the War Claims Commission merely because he wanted his own appointees on such a Commission, we are compelled to conclude that no such power is given to the President directly by the Constitution, and none is impliedly conferred upon him by statute simply because Congress said nothing about it. The philosophy of *Humphrey's Executor*, in its explicit language as well as its implications, precludes such a claim.

*Id.* at 356.

Subsequently, in *Seila Law*, 591 U.S. 197, the Court interpreted and reaffirmed the holding of *Humphrey's Executor*. In *Seila Law*, the Court invalidated the statutory for-cause removal clause concerning the Director of the Consumer Financial Protection Bureau (CFPB). The heart of the Court's concern in *Seila Law* was that the CFPB statute placed too little accountability and too much authority in a single person. The Court emphasized the marked contrast between the CFPB's structure and that of "traditional independent agencies," such as the FTC in *Humphrey's Executor* and the EEOC today, which consist of multimember, bipartisan experts who serve staggered terms. *Id.* at 203, 207. It characterized the *Humphrey's Executor* exception as applying to "multimember expert agencies that do not wield substantial executive power." *Id.* at 218.

Earlier this year, in *Trump v. Wilcox*, 145 S. Ct. 1415, the Supreme Court issued an order staying district court orders granting relief pending resolutions of the merits in cases involving President Trump's firing of members from two independent agencies, the National Labor Relations Board (NLRB) and Merit Systems Protection Board (MSPB). Citing to *Seila Law*, the Court's

opinion suggests that the *Humphrey's Executor* exception would not apply if the agency "exercised considerable executive authority."[1] *Id.* at 1415.[2]

Thus, *Humphrey's Executor* and the cases interpreting it create the enduring framework that applies to resolving the primary issues raised by this Motion: whether Congress intended limitations on removal of members of the EEOC and whether the EEOC is a multimember expert agency that does not wield substantial executive power.

## II.    Congress intended the EEOC to be independent, and protecting the Commissioners from at-will removal promotes the Agency's independence.

In *Wiener*, as discussed above, the Supreme Court inferred that Congress intended to limit the President's ability to remove members of the War Claims Commission because of the "nature

---

[1] The Government alternates between stating that the threshold for determining whether a principal officer exercises enough executive power to warrant at-will removal is "any" executive power, Brief at 2, 26, or "substantial" or "considerable" executive power." *Id.* at 1, 13, 27, 30, 32. A fair reading of the cases shows that the threshold is whether the agency exercises "substantial" or "considerable" executive power as opposed to "any" executive power. In deciding *Humphrey's Executor*, the Court found no basis for at-will removal where the duties involved were "predominantly quasi judicial and quasi legislative." 295 U.S. at 624. *Seila Law* uses different language in different parts of the opinion, sometimes discussing whether the agency in question wields "significant" executive power, 591 U.S. at 199, 220, other times "substantial" executive power, *id.* at 218, and other times "any" executive power, *id.* at 216. But, when the Court described the two exceptions for when Congress can limit the removal authority of the president, it used the phrase "substantial executive power" for the *Humphrey's Executor* exception. *Id.* at 218. Moreover, the concurring and dissenting opinions categorize the majority's test as "substantial executive power." *Id.* at 239 (Thomas, J., concurring and dissenting) ("the Court takes a step in the right direction by limiting *Humphrey's Executor* to 'multimember expert agencies that *do not wield substantial executive power*'") (cleaned up) (emphasis in original); *id.* at 250 (Kagan, J., concurring and dissenting) ("the Court concludes that *Humphrey's Executor* must be limited to multimember expert agencies that *do not wield substantial executive power*") (emphasis in original). In *Wilcox*, 145 S. Ct. 1415, the Supreme Court stayed the lower court decision in part because "the Government [was] likely to show that both the NLRB and MSPB exercise considerable executive power." This brief uses the phrase "substantial executive power" for ease of reference, but the analysis and result would be no different if "considerable executive power" is the operative standard.

[2] More recently, the Supreme Court in *Trump v. Boyle*, No. 25A11, slip op. (U.S. July 23, 2025), stayed the district court's order enjoining the removal of three members of the Consumer Product Safety Commission (CPSC). The Court stated that *Wilcox*, "squarely controlled" and that the CPSC "exercises executive power in a similar manner as the National Labor Relations Board" but, as in *Wilcox*, did not say how the Commission exercises that executive power. Slip op., at 1.

of the function that Congress vested in the [agency]," even though the statute had no language limiting removal. 357 U.S. at 353. Citing to *Humphrey's Executor* and *Wiener*, the D.C. Circuit stated in *Severino*, that "Congress may clearly indicate its intent to restrict removals through the statutory structure and function of an office." 71 F. 4th at 1044. Since *Wiener,* courts have found or assumed implied removal protections for members of agencies such as the Securities and Exchange Commission (SEC), Federal Election Commission (FEC), and the National Credit Union Administration (NCUA). *See, e.g.*, *Free Enter. Fund.*, 561 U.S. at 487 (SEC); *F.E.C. v. NRA Pol. Victory Fund.*, 6 F.3d 821, 826 (D.C. Cir. 1993) (FEC); *Jarkesy v. SEC*, 34 F.4th 446, 464 (5th Cir. 2022) (SEC), *aff'd on other grounds*, 603 U.S. 109 (2024); *Harper v. Bessent*, 2025 WL 2049207 (NCUA).

While giving lip service to the holding in *Wiener* and the standard in *Severino*, the Government's perfunctory analysis of the structure and functions of the EEOC leads back to its principal argument that when Congress intends limitations on removal, it includes an explicit removal clause in the statute. Brief at 20. But in fact, both the structure and functions of the Agency demonstrate that Congress intended that EEOC Commissioners have protection from at-will removal. Regarding structure, the partisan balance Congress directed is incompatible with at-will removal; other structural components like a term of years, holdover clause, and staggered terms provide further support. Moreover, the Agency's role in adjudicating federal sector discrimination cases, among other functions, necessitates independence; otherwise, the Executive Branch, which effectively is a defendant in these matters, would have the unlimited authority to remove those responsible for determining its liability on appeal. This function as well as other quasi-judicial functions, such as the Commission's role as a "judicial aid" in processing

discrimination claims, *Humphrey's Ex'r*, 295 U.S. at 628, as well as its quasi-legislative functions, bring this case squarely under *Wiener*.

A.    **The structure of the EEOC demonstrates Congress's intent to prohibit at-will removals.**

Congress created the EEOC with certain structural features set forth at 42 U.S.C. § 2000e-4(a) that demonstrate a clear intent to place restrictions on the president's removal power. Foremost, the bipartisan structure supports the inference that Congress did not intend for the president to have absolute removal power, since that bipartisan nature could be obliterated if the president had unfettered authority to remove disfavored Commissioners who are not of his party. President Trump has removed two of the three Democratic Commissioners and deprived the Commission of a quorum. This clearly is contrary to how Congress intended the Commission to operate. President Trump removed Commissioner Samuels for reasons similar to the those used by President Roosevelt in firing Mr. Humphrey and President Eisenhower in firing Mr. Wiener, which the Supreme Court unanimously found in both cases failed to satisfy the standard for removal. Additionally, other features of Title VII demonstrate Congress's intent to impose removal limitations. "[S]taggered terms promote 'the independence, autonomy, and non-partisan nature' of an agency." *Severino*, 71 F.3d at 1049. The fixed term of years, combined with the provision enabling Commissioners to hold over after expiration of their term until their successor is appointed or the end of the Congressional term, is consistent with independence. Recently, this Court found that Congress intended that the NCUA, which has a similar structure to the EEOC, have a removal limitation provision absent an explicit clause in the statute. *Harper*, 2025 WL 2049207, at * 5. There is no reason the result here should be different.

The Government's arguments to the contrary are lacking. Other than its repeated refrain that if Congress had intended a removal limitation it would have said so in the statute, the

Government references *Severino* and claims that if the structural features "were insufficient in *Severino* to overcome the absence of an express for-cause removal provision, then surely the features of the EEOC fail as well." Brief at 20. But in reality, the structure of the agency at issue in *Severino* was different in several important respects from that of the EEOC. While the Government, without support, claims that the agency involved in *Severino*, the Administrative Conference of the United States (ACUS), was "meant to be non-partisan," *id.*, the actual structure set forth in the statute reveals otherwise. The council of the ACUS is appointed by the president without Congressional involvement, and up to half the members "shall be employees of Federal regulatory agencies or Executive departments." 5 U.S.C. § 595(b). Moreover, as opposed to the staggered terms of EEOC Commissioners, for those federal employees who served on the ACUS Council, "the service of any member ends when a change in his employment status would make him ineligible for Council membership under the conditions of his original appointment." *Id.* In *Severino*, Congress made clear that the structure of the ACUS was designed to be under the control of the President.

**B.      The functions of the Commission demonstrate that Congress intended that the Commissioners have protection from at-will removal.**

*Wiener* established that when an agency has quasi-judicial functions that require independence from Congress and the Executive, courts should infer that Congress intended to insulate the agency's principal officers, who carry out those duties, from at-will removal by the president. In *Severino*, the D.C. Circuit stated "under *Humphrey's Executor*'s and *Wiener*'s binding precedent, when Congress assigns to an agency quasi-judicial or quasi-legislative functions that are deemed to be operationally incompatible with at-will Presidential removal, that can be a relevant signal that Congress meant for members of that agency to be shielded from Presidential removal, even without an explicit textual statement to that effect." 71 F.4th at 1047.

In *Harper*, 2025 WL 2049207, at *5–7, this Court recently found that the quasi-judicial and quasi-legislative functions of the NCUA showed that Congress intended limitations on removal even though the governing statute did not have a removal clause. The EEOC has similar quasi-judicial and quasi-legislative functions.

The Commission has a critical, quasi-judicial function that necessitates independence from the President: it adjudicates certain federal sector employment cases where a federal agency is the defending party. If the President had at-will removal power over Commissioners, the Executive Branch would have the unfettered authority to remove those who serve as judges of the liability of the Executive Branch and could thus undermine the impartiality of this quasi-judicial process. Though the Government briefly acknowledges this function as part of a list of Commission functions in its statutory inference section, Brief at 21, it does not explain how at-will removal can be reconciled with the need for Commission independence in deciding federal sector cases. Nor can it.

Another core function of the Commission is serving as a "judicial aid" in the charge process. *Humphrey's Ex'r*, 295 U.S. at 628. As discussed in greater length in the Statutory Background Section, *supra*, at 3–9, and in Section III.B, *infra*, at 24–34, the Commission plays an important role in filtering and resolving discrimination charges brought by and on behalf of aggrieved citizens. The Commission examines those charges, seeks to resolve them, issues private parties right to sue letters, and in a small number of matters, engages in litigation. In all except the latter action, this function mimics what judges do and aids the judiciary by substantially reducing the number of discrimination claims that would otherwise have to be handled in court. If aggrieved parties could bypass the Commission and bring discrimination complaints directly in federal court, all such claims would require judicial resources.

19

Additionally, the Commission exercises what this Court has recognized as quasi-legislative functions. In *Harper*, 2025 WL 2049207, at * 6, this Court found that two quasi-legislative functions of the NCUA were indicia that Congress intended that there be limitations on the president's removal authority: the agency's "statutory authority to prescribe rules and regulations" under the governing statute and the reports Congress required the agency to submit to Congress and the president. As discussed more fully above in the Statutory Background Section, *supra*, at 3–9, and below in Section III.B, *infra*, at 24–34, Congress gave the EEOC similar responsibilities.

The Government's brief argument as to why the functions of the Commission do not support an inference that Congress intended the Commissioners to have protections from at-will removal largely just previews its argument that the agency exercises substantial executive authority. Brief at 21–22. Though agency functions are relevant both to the statutory question (whether Congress intended restrictions on removal of a principal officer at-will) and the constitutional question (whether the officer is exercising substantial executive authority), the analysis is different, and Plaintiff will address the analysis relevant to the constitutional question, Section III, *infra*, at 22–36.

The Government also contends that the recent Supreme Court decision in *Kennedy v. Braidwood Management, Inc.*, 145 S. Ct. 2427 (2025), means that absent explicit statutory language regarding removal, officers can be removed at will. Brief at 17–18. But *Braidwood* is inapplicable and confronted a fundamentally different question from the one at issue here.

In *Braidwood*, the Supreme Court addressed whether the Secretary of Health & Human Services' (HHS) appointment of members of the U. S. Preventive Services Task Force violated the Appointments Clause. *Id.* at 2442. The statute provides that the "Director of the Centers for Disease Control and Prevention shall convene" the Task Force, 42 U.S.C. § 280g-10(a), to provide

recommendations regarding preventive health services that the Secretary of HHS has the discretion to block. *Id*. at 2445. Other than stating that an agency official would convene the Task Force and that the Task Force would be "composed of individuals with appropriate expertise," Congress did not set forth a structure for the Task Force: it did not identify the number of members, whether they had terms, or if they did, whether the terms were staggered. 42 U.S.C. § 299b-4(a)(1). In operation, there are sixteen members appointed to the Task Force by the Secretary of HHS who serve four-year staggered terms as volunteers. *Braidwood*, 145 S. Ct. at 2439.

The plaintiffs in *Braidwood* claimed that members of the Task Force were principal officers who must be appointed by the President, *id*. at 2441, and thus that any insurance coverage mandates recommended by the Task Force were unconstitutionally issued. In determining that the Task Force members were inferior officers, one factor the Court considered was whether the officers were removable at will. The Court found that "Braidwood has not identified any instance where an executive officer was removable at will by someone other than the President and nonetheless deemed a principal officer." *Id*. at 2444. The Court then found that because the Secretary had the power to appoint the Task Force members and the statute was silent on removal, the Secretary could remove the members at will and that they were thus inferior officers. *Id*.

*Braidwood* is thus fundamentally inapposite here. The fundamental question in *Braidwood*—whether the officers in question are principal or inferior officers—is not at issue because the Commission members are clearly principal officers. In contrast to the Task Force, where Congress left it to agency officials to determine the structure and made the Task Force's work subject to an agency head, Congress created a structure for the Commission and gave it a structure and functions that, as discussed above, indicate independence from at-will removal. Indeed, in *Braidwood*, the Supreme Court did not even mention *Wiener*, the leading case regarding

whether Congress intended protection from at-will removal for a principal officer who is part of a multi-member board where the statute is silent on the issue.  If the Supreme Court believed that *Braidwood* had application to principal officers, it surely would have addressed *Wiener* in some fashion.

Even if *Braidwood* were to apply to principal officers, it would not lead to the conclusion the Government suggests here because *Wiener* controls.  *Wiener* directly addresses the analysis for principal officers who exercise adjudicatory functions.  That was how a D.C. Circuit special motions panel harmonized *Braidwood* and *Wiener* recently in *LeBlanc v. v. Priv. and C.L. Oversight Board*, No. 25-5197, 2025 WL 1840591, at *1 (D.C. Cir. July 1, 2025).[3]

## III.    Under *Humphrey's Executor* and *Seila Law*, preventing the President from removing EEOC Commissioners at will does not violate the Constitution.

In *Seila Law*, the Supreme Court characterized the *Humphrey's Executor* exception as applying to "multimember expert agencies that do not wield substantial executive power."  591 U.S. at 218.  In applying that standard to the agency before it, the Court then analyzed those two components—whether the CFPB was a multimember expert agency and whether the officer at issue exercised substantial executive power.  *Id.* at 219–20. The district court recently articulated this test in *Grundmann*.

> *Seila Law* is best read as teaching that the *Humphrey's Executor* exception applies in two steps.  First, courts must ask whether an agency's structure resembles that of the "New Deal-era FTC" described in *Humphrey's Executor*.  Second, courts must ensure that the agency does not exercise substantial executive power.  If both conditions are met, then Congress has the authority to provide removal restrictions.

---

[3] Within the portion of its Brief contending that Title VII permits the president to remove the Commissioners at will, the Government argues that the Court should decide the issue in its favor as a matter of constitutional avoidance.  Brief at 24.  The gist of the argument is that the Court should adopt the Government's view that if there is no explicit reference to removal within the statute, the Court should simply end its inquiry there to avoid dealing with the constitutional issue of whether Congress could prevent the President from having at-will removal power.  This argument is contrary to the controlling authority of *Wiener* and *Severino*, which as discussed above, require the Court to consider the structure and functions of the agency to determine whether Congress intended to prohibit at-will removal.

770 F. Supp. 3d. at 175 (citing *Seila Law*, 591 U.S. at 218–19). After examining those two questions as well as other aspects of the CFPB, the Court in *Seila Law* found that the *Humphrey's Executor* exception did not apply to the CFPB Director. 591 U.S. at 218–20.

In applying that standard to the EEOC Commissioners, the *Humphrey's Executor* exception applies. The EEOC's structure has all the components of a multimember expert agency identified in *Seila Law*. With respect to functions, the Government fails to demonstrate that the Agency has substantial executive functions and that those functions are carried out by the Commissioners, as opposed to the Chair or the General Counsel, over whom the President exercises control.

### A. The structure of the EEOC supports the constitutionality of for-cause removal protections.

There can be no serious dispute that the EEOC has the structure of an agency that falls under the *Humphrey's Executor* exception as described in *Seila Law,* and the Government's brief does not appear to argue otherwise. In *Humphrey's Executor*, the Court "identified several organizational features that helped explain its characterization of the FTC as non-executive." *Seila Law*, 591 U.S. at 216 (citing *Humphrey's Ex'r*, 295 U.S. at 619–20, 624). The Court noted that the FTC was "[c]omposed of five members—no more than three from the same political party." *Id.* (citing *Humphrey's Ex'r*, 295 U.S. at 624). This bipartisan requirement indicates that the FTC was "designed to be 'non-partisan' and to 'act with entire impartiality.'" *Id.* (quoting *Humphrey's Ex'r*, 295 U.S. at 624). The FTC Commissioners' "staggered, seven-year terms enabled the agency to accumulate technical expertise and avoid a 'complete change' in leadership 'at any one time.'" *Id.* (quoting *Humphrey's Ex'r*, 295 U.S. at 624). Additionally, the FTC's duties were "neither political nor executive" because they "called for 'the trained judgment of a body of experts' 'informed by experience.'" *Id.* (quoting *Humphrey's Ex'r*, 295 U.S. at 624). The Court characterized these features as ones characteristic of a "traditional independent agency headed by a multimember

board or commission," *id.* at 207, and contrasted them with the structure of the CFPB, which is headed by a single-Director, *id.* at 218.

The EEOC contains all of these features of a multimember board of experts. The EEOC is composed of five members, not more than three of whom shall be members of the same political party. Compl. ¶ 17; 42 U.S.C. § 2000e-4(a). In addition, EEOC Commissioners serve staggered five-year terms, Compl. ¶¶ 17–18; 42 U.S.C. § 2000e-4(a); Pub. L. No. 88-352, § 705(a), 78 Stat. 241 (1964), which "prevent[s] complete turnovers in agency leadership and guarantee[s] that there would always be some Commissioners who had accrued significant expertise." *Seila Law*, 591 U.S. at 218. That significant expertise enables the Commissioners to act as a "body of experts" and is consistent with Congress's intent that the EEOC be composed of specialists with "expertise relating to the resolution of problems of employment discrimination." *Hopkins v. Price Waterhouse*, 920 F.2d 967, 979 (D.C. Cir. 1990) (quoting S. Rep. No. 415, 92d Cong., 1st Sess. 18 (1971)); *see also* Compl. ¶ 17 (detailing Commissioner Samuels's subject matter expertise). The EEOC's structure therefore falls within the *Humphrey's Executor* exception. *See Grundmann*, 770 F. Supp. 3d at 177.

### B.    EEOC Commissioners do not exercise substantial executive power.

The issue of whether an agency leader performs substantial executive power "is a fact-bound inquiry" into the agency's functions and who performs them. *Grundmann*, 770 F. Supp. 3d at 177. In the case of the EEOC, the Agency's functions are primarily quasi-adjudicative, quasi-legislative, and educational—and are thus not executive. The Agency's scant executive functions are performed by the Chair or the General Counsel, and not the other Commissioners. *See* Statutory Background Section, *supra*, at 3–9, and Section III.B *infra*, at 25–35.

The Government's argument that the Commission exercises substantial executive authority largely rests on a few functions: its adjudication of federal sector discrimination complaints, Brief at 28–29; its statutory responsibilities relating to charges filed by the private sector or state/local government workforce, Brief at 27–28; and its rulemaking responsibilities, Brief at 30.[4]  But the Government mischaracterizes these functions.

*Federal Sector Discrimination Complaints*.  As discussed above, the EEOC adjudicates discrimination complaints filed by federal employees.  The Supreme Court has consistently held that the resolution of discrete claims by applying statutory standards is quasi-judicial.  *See Humphrey's Ex'r*, 295 U.S. at 620 (holding that the FTC's functions were quasi-judicial because it could hold "hearing[s]" on claims); *Wiener*, 357 U.S. at 355–56 (holding that the War Claims Commission exercised a quasi-judicial function by applying "evidence and governing legal considerations" to the "merits" of claims").  In *Wiener*, for example, the Supreme Court recognized that the War Claims Commission exercised a purely adjudicative function because Congress could have "given jurisdiction" over the classes of claims defined in the War Claims Act "to the District Courts or to the Court of Claims."  357 U.S. at 355.  So too, here, the adjudicative tasks with which the EEOC is charged have an "intrinsic judicial character."  *Id.*

---

[4]  The Government cites to the *Wilcox* decision and states that because the EEOC is like the NLRB and MSPB in certain respects, this Court should grant its motion.  Brief at 30–32.  But as the Supreme Court stated, "we do not ultimately decide in this posture whether the NLRB or MSPB falls within [the Humphrey's Executor exception]; that question is better left for resolution after full briefing and argument."  *Wilcox*, 145 S. Ct. at 1415.  Even were this Court to consider the *Wilcox* stay order "at face value," the order passed only on removal protections as pertaining to the NLRB and the MSPB, without articulating which of the many functions that these agencies perform constitutes an exercise of "considerable" executive power.  *See id*.  It is thus impossible to say that any adjudged likely exercise of considerable executive power by the NLRB or MSPB is shared by the EEOC, because it is impossible to say that the EEOC performs the same unidentified function that gives rise to this exercise, particularly where many of the EEOC's functions differ from those of the NLRB and MSPB.

While describing this function as the "authority to adjudicate," the Government contends, without citing any supporting case law, that the EEOC exercises substantial executive power by directly adjudicating federal sector employment discrimination claims and ordering "mandatory" relief.  Brief at 28–29.  But the Commissioners' role in resolving federal sector claims is passive, and the Agency's power to enforce relief is limited.  Like with the MSPB, the EEOC "must wait for . . . [federal sector cases] to be initiated by employees."  *Harris v. Bessent*, No. 25-5037, 2025 WL 980278, at *30 (D.C. Cir. Mar. 28, 2025) (Millett, J., dissenting), *vacated on reconsideration en banc*, No. 25-5037, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025)).  After employees initiate these cases, the EEOC issues decisions in those that are appealed to it, but it lacks the power to enforce these decisions; instead, if an agency fails to comply with the Commission's decision, an employee will ordinarily have to file a civil action in an Article III court to enforce compliance with the Commission's order.  42 U.S.C. § 2000e-16(c).  In other words, because the Commission cannot require the agency to comply with its order, or even seek enforcement of its order in court, the complainant federal employee must "submit[] [its] recommended dispositions to an Article III court" for enforcement.  *Seila Law*, 591 U.S. at 218–19; *Humphrey's Ex'r*, 295 U.S. at 620–21 (noting that if an FTC order were disobeyed, "the commission [would have to] apply to the appropriate Circuit Court of Appeals for its enforcement").

*Private Sector Charges.*  The EEOC's role with respect to handling charges of private discrimination is primarily quasi-judicial and comparable to the FTC's authority in *Humphrey's Executor*.  The EEOC's processes are quasi-judicial in two ways: (1) the Agency serves as a "judicial aid" by reducing the number of discrimination cases courts hear; and (2) the EEOC's resolution efforts are modeled after judicial activities and functions.

Private sector charges start with the formal filing of a charge under oath by or on behalf of an aggrieved party. *EEOC v. Shell Oil*, 466 U.S. 54, 62–65 (1984); 42 U.S.C. § 2000e-5(b). The Commission's staff investigates charges of employment discrimination and works to resolve those claims through mediation or negotiated settlement. 29 C.F.R. §§ 1601.15–17, 20. If the matter is not resolved and the Commission staff makes a no-cause determination, the staff close their investigation and provide the aggrieved party with a right to sue letter so that the person can file a federal discrimination lawsuit. 29 C.F.R. § 1601.19. If Commission staff make a cause determination, the Agency first attempts to reach a conciliation agreement, and only if that fails, *see* 29 C.F.R. §§ 1601.24–1601.25, 1601.27, the Agency considers the matter for litigation. Congress assigned the EEOC's General Counsel "responsibility for the conduct of litigation" for the Agency. 42 U.S.C. § 2000e-4(b)(1); *see also Standards and Procedures for Settlement of EEOC Litigation*, EEOC (May 21, 2024), https://perma.cc/X3N2-T9K6 ("The General Counsel controls the agency's litigation, and thus has the authority to decide whether to settle EEOC lawsuits and on what terms"). The Agency litigates a very small percentage of charges; for example, in Fiscal Year 2024, 88,531 charges were filed with the EEOC and the agency filed 111 lawsuits. *EEOC Publishes Annual Performance and General Counsel Reports for Fiscal Year 2024*, EEOC (Jan. 17, 2025), https://perma.cc/83UZ-XSDX.

Although the Government notes several of the aspects of the private sector charge process, including that the EEOC conducts investigations, engages in conciliation and mediation, issues and goes to court to enforce subpoenas as part of the investigation process, and files litigation in a small number of cases, it fails to demonstrate how this process is an exercise of executive authority as defined under *Humphrey's Executor*. Indeed, in *Humphrey's Executor*, Congress had empowered the FTC to issue complaints that stated charges. The charged party had the right to

appear before the FTC and "show cause why an order to cease and desist should not be issued." 295 U.S. at 620. After the hearing, Congress empowered the FTC to issue a cease-and-desist order where appropriate, which the FTC could enforce in a civil action in circuit court if not obeyed and the charged party could appeal to the circuit court. *Id.* The Court did not find that these functions constituted the exercise of executive authority. The EEOC's authority is far less than that of FTC in *Humphrey's Executor*, and the Agency serves an even greater role as a judicial aid. Unlike the FTC, which instituted its own complaints, the Commission waits for charges to be filed under Title VII except in the rare circumstance, when a Commissioner files a charge.[5]

*Conciliation and Mediation*. Congress made mediation and conciliation a core component of the charge investigation process prior to the filing of litigation. 42 U.S.C. § 2000e-5(b) ("If the Commission determines after . . . investigation that there is reasonable cause to believe that the charge is true, the Commission shall endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion."). The EEOC's conciliation and mediation processes unquestionably serve a valuable role in aiding the judiciary. As the Supreme Court has noted: "In pursuing the goal of 'bringing employment discrimination to an end,' Congress chose 'cooperation and voluntary compliance' as its 'preferred means.'" *Mach Mining, LLC v. E.E.O.C.*, 575 U.S. 480, 486 (U.S. 2015) (cleaned up) (quoting *Ford Motor Co. v. EEOC*, 458 U.S. 219, 228 (1982)). The EEOC's efforts to resolve discrimination charges through conciliation and mediation are thus a "key component of [Title VII's] statutory scheme." *Id.*

*Initiating Legal Process and Litigation*. Regarding the Agency's subpoena authority and right to go to court to enforce subpoenas, the FTC at the time of *Humphrey's Executor* had these

---

[5] A Commissioner may, under certain circumstances, file a charge under oath. 42 U.S.C. § 2000e-5(b). Commissioner charges are rare: for example, in Fiscal Year 2024, Commissioners filed 33 charges of the 88,531 total charges filed. *See 2024 Annual Performance* Report, EEOC (Jan. 17, 2025), https://perma.cc/Q3RM-4JPM.

powers as well.  *Slaughter*, 2025 WL 1984396, at *11.  The Government's argument that the Commission's ability to bring civil lawsuits is an exercise of substantial executive power, Brief at 28, also falls short.  First, the EEOC's authority to bring civil lawsuits based on charges that almost always come from outside the agency[6] is less of an intrusion on the president's executive authority than in *Humphrey's Executor*, 295 U.S. at 620, where the agency could and did instigate the charges, rule on them, and enforce them in court if the charged party disobeyed its order.

Second, the litigating authority has been delegated by Congress to the General Counsel. As discussed above, the EEOC did not originally have the authority to bring civil actions regarding a charge of discrimination.  When Congress granted the Agency the authority to file lawsuits in 1972, it also added a presidentially-nominated and Senate-approved General Counsel that it designated as "responsible for the conduct of litigation" under the provisions enabling the agency to bring civil lawsuits.  42 U.S.C. § 2000e-4(b).  As the EEOC's own organizational documents indicate, *see* Statutory Background Section, *supra*, at 3–9, the General Counsel's responsibility for the conduct of litigation is exercised independently from the Commissioners.  And so even if filing and litigating civil actions were an executive function, the President has control over it through the General Counsel—the Commissioners can neither compel the General Counsel to file a lawsuit nor to maintain it.  As a case in point, when President Trump removed Commissioner Samuels, he also fired the General Counsel, who has not challenged her firing by filing suit.  After the President appointed the Acting General Counsel, that official subsequently dismissed six EEOC lawsuits involving claims against employers alleging that they had engaged in LGBTQ+-related discrimination in the workplace.  *EEOC Moves to Drop Transgender Discrimination Cases to*

---

[6] According to the Agency, the EEOC filed eight lawsuits based on Commissioner charges over a ten-year period.  *See Commissioner* Charges, EEOC (last visited Jul. 28, 2025), https://perma.cc/SJ5W-BREL.

*Comply with Trump's Order*, PBS NEWS (Feb. 15, 2025, 7:04 PM), https://perma.cc/V3EC-ZXLD.
This was one of the issues of disagreement that the President cited when he removed
Commissioner Samuels.  That the lawsuits could have been dismissed even if Commissioner
Samuels remained on the Commission demonstrates the President's ability to control this function
of the Agency.  Indeed, in other removal cases, courts have cited the General Counsel's
independent role in conducting litigation under the governing statute and the president's control
over the General Counsel in finding that an agency's litigation authority did not establish that
agency board members/commissioners were exercising substantial executive authority.  *See, e.g.*,
*Wilcox*, 775 F. Supp. 3d at 225 ("In fact, the Board does not prosecute labor cases nor enforce its
rulings. The side of the NLRB managed by the General Counsel—who is removable at-will by the
President—carries out those more "executive' powers."); *Grundmann*, 770 F. Supp. 3d at 179.

Third, the Agency only files lawsuits in a small percentage of charges filed with the
Agency.  *See Data and Analytics – Overview*, EEOC, https://perma.cc/LLK3-VZZQ (providing
statistics that show that the EEOC filed suit in 0.1% of the cases for which charges were filed).
Moreover, it only does so if the Commission's efforts at mediation and conciliation (*i.e.*, its quasi-
adjudicatory functions) have failed and there is a finding of reasonable cause.  The vast majority
of cases are filed by the aggrieved parties who file suit only after the EEOC mediation,
investigation, and conciliation process, where the Agency is acting "as a judicial aid" but does not
achieve resolution.  Under these circumstances, the Commissioners can hardly be said to exercise
substantial executive authority through this function.[7]

---

[7]  In this portion of the Brief, the Government briefly notes that the EEOC files amicus briefs
through its lawyers without explaining the significance of that fact.  Brief at 28.  Where this is done, the
Commission can hardly be said to be engaging in a substantial executive function.  Instead, acting as a
friend to the court, it is assisting the judicial branch in the execution of its own adjudicatory functions.

Relatedly, the Government also notes that the EEOC's own lawyers, as opposed to lawyers from the Department of Justice, represent the Commission in actions in the lower federal courts. Brief at 28. As an initial matter, it is not clear why this would cause the EEOC's litigation function to rise to the level of substantial executive power. "[I]ndependent litigating authority is not uniquely executive in character." *Harris*, 2025 WL 980278, at *32 (Millett, J., dissenting); *Grundmann*, 770 F. Supp. 3d at 178 (noting that "it is not clear" why having FLRA attorneys represent the agency "would make this power more substantial"). The Senate Legal Counsel and the General Counsel of the House represent the Senate and the House, respectively, in court. 2 U.S.C. §§ 288c, 5571(a). And both the Securities and Exchange Commission (SEC), whose removal protections the Supreme Court previously assumed in *Free Enterprise Fund*, 561 U.S. 477, and the Federal Reserve Board can be represented by their own lawyers in court. 12 U.S.C. § 248(p) (FRB); 15 U.S.C. §§ 77t(b)–(c), 78u(c)–(e) (SEC); *see also Harris v. Bessent*, 775 F. Supp. 3d 86, 91 (D.D.C. 2025) (rejecting the government's argument that the *Humphrey's Executor* exception did not apply to the MSPB because "it may . . . litigate on its own behalf"). Moreover, in none of the cases in which the Supreme Court has held that an agency exercises substantial executive power has it indicated that the agency's representation in court by its own lawyers was significant, or even a factor.

*Legislative Rulemaking.* The EEOC also has significant quasi-legislative functions. In Title VII, the ADA, the ADEA, and the PWFA, among other statutes, Congress directed or delegated to the EEOC the authority to issue procedural or substantive rules or regulations to effectuate the terms of a statute. *See, e.g.,* 42 U.S.C. § 12116 (ADA); 29 C.F.R. pt. 1630 (ADA); 29 U.S.C. § 628 (ADEA); 29 C.F.R. pts. 1625–1627 (ADEA); 42 U.S.C. § 2000gg-3(a) (PWFA); 29 C.F.R. pt. 1636 (PWFA). In *Humphrey's Executor*, the Court explained that the FTC, which

31

was "created by Congress to carry into effect legislative policies embodied in the statute in accordance with the legislative standard therein prescribed . . . cannot in any proper sense be characterized as an arm or an eye of the executive." 295 U.S. at 628. The Court instead concluded that the FTC was an "independent regulatory agenc[y], . . . which engage[s] in the 'quasi-legislative activity' of rulemaking." *Morrison*, 487 U.S. at 724–25 (Scalia, J., dissenting). The EEOC also performs a quintessential quasi-legislative function by "making 'investigations and reports' to Congress." *Seila Law*, 591 U.S. at 215–16 (quoting *Humphrey's Ex'r*, 295 U.S. at 628) (explaining that the FTC acted as a "legislative agency" when it made reports to and conducted investigations for Congress); 42 U.S.C. § 2000e-4(e) (establishing that the Commission "shall make such further reports on the cause of and means of eliminating discrimination and such recommendations for further legislation as may appear desirable").

The Government cites the regulations promulgated by the Agency as well as non-binding guidance as *indicia* of the exercise of substantial executive authority. Brief at 21, 23 n.16, 29–30. As the Government notes, Brief at 30 & n.31, the EEOC has authority to promulgate procedural regulations for some statutes, *see* 42 U.S.C. § 2000e-12(a) (Title VII), and substantive regulations for other statutes that embody federal discrimination laws, *see* 42 U.S.C. § 12116 (ADA); 29 U.S.C. § 628 (ADEA); 42 U.S.C. § 2000gg-3(a) (PWFA).

By their nature, administrative regulations are quasi-legislative because they result from Congress directing or delegating authority to agencies to create rules and regulations within a defined area. *Harper*, 2025 WL 2049207, at * 6. In delegating this type of responsibility to a bi-partisan, multi-member agency, Congress must have expected the Commission to engage in the types of discussion, negotiation, and compromise—not unlike a legislative body—that come from multiple perspectives. The Government never explains why regulatory authority is not quasi-

32

legislative but instead merely quotes a sentence from *Collins*: "[I]nterpreting a law enacted by Congress to implement the legislative mandate is the very essence of 'execution' of the law." 594 U.S. at 254 (cleaned up); Brief at 30.

But *Collins* does not support the conclusion that issuing regulations is an "executive function" within the meaning of the *Humphrey's Executor* exception, let alone a "substantial" one. The *Collins* Court did not discuss *Humphrey's Executor* or analyze what constitutes substantial executive power; rather, it characterized its decision as a "straightforward application of [its] reasoning in *Seila Law*," because the agency at-issue in *Collins* (the FHFA) was also "led by a single Director." 594 U.S. 251.

In *Seila Law*, the Court expressed concern about the CFPB's regulatory authority because of both the scope of that authority and the fact that it was vested in one person: "[T]he Director has the sole responsibility to administer 19 separate consumer-protection statutes that cover everything from credit cards and car payments to mortgages and student loans." *Seila Law*, 591 U.S. at 219. Because, unlike *Seila Law*, the EEOC's regulatory authority is not vested in one person and is more limited in scope, it does not an exercise of substantial executive authority. *Grundmann*, 770 F. Supp. 3d at 178; *Harper*, 2025 WL 2049207, at * 6. Moreover, non-binding guidance can hardly be characterized as an exercise of executive authority because, by definition, nobody is required to follow it.

*Other Agency Functions.* The remaining functions that the Government mentions are quasi-legislative, "body of expert" functions, as opposed to executive functions. As the Government notes, Brief at 21–22, Congress empowered the EEOC to serve in an advisory role to federal agencies to assist them in complying with equal employment opportunity laws, and as part of that function to report to Congress and the president annually about administrative changes. 42

U.S.C. § 2000e-14. Assisting federal agencies in their efforts to achieve compliance with the law and reporting to Congress and the president about statutory or administrative recommendations is hardly an executive function when it is not accompanied by any enforcement authority. The same is true with respect to the Commission's efforts to provide education, technical assistance, and training regarding the federal discrimination laws administered by the Commission.

### C.    The Government's remaining constitutional arguments are unavailing.

The Government makes two additional constitutional arguments outside the *Humphrey's Executor/Seila Law* framework that Plaintiff briefly addresses.

First, the Government argues that denying the president the power to remove Plaintiff over her expressions of disagreement with certain Executive Orders would be unconstitutional.[8] The facts here are not materially different than in *Humphrey's Executor*, 295 U.S. at 618–19, and *Wiener*, 357 U.S. at 350, 354, where Presidents Roosevelt and Eisenhower removed independent agency leaders over policy differences and the Supreme Court unanimously found in each case that the removals were improper.

Second, citing *City of Arlington, Texas v. F.C.C.*, 569 U.S. 290, 304 n.4 (2013), the Government claims that even when agencies like the EEOC engage in adjudicative and rulemaking activities that take legislative and judicial forms, they are exercising executive authority. Brief at 29. *City of Arlington* considered whether a ruling by the Federal Communications Commission (FCC) was entitled to *Chevron* deference and did not touch on the relevant issue here: Congress's power to limit the President's removal authority. *Id.* at 307. In *City of Arlington*, the Court explained that when federal agencies like the FCC "make rules" and "conduct adjudications," these

---

[8] The Government mischaracterizes Plaintiff's statements as her "acknowledg[ing] that she publicly sought to use her office to obstruct the President's policies," Brief at 25. Expressing disagreement and obstructing are not the same, especially given the vast power the President holds.

activities "take 'legislative' and 'judicial' forms," but are exercises of "executive Power" "under

our constitutional structure." 569 U.S. at 304 n.4. In other words, federal agencies exercise

executive power because, under our constitutional structure, they are housed within the executive

branch. The Government made the same argument in *Wilcox* and the district court aptly

demonstrated why it is incompatible with *Humphrey's Executor*:

> Defendants' argument about the exercise of "executive power" is ultimately
> tautological and leaves *Humphrey's Executor* completely devoid of force. They
> reason that because the NLRB is housed within the executive branch, the Board
> inherently exercises "executive power." Reading *Humphrey's Executor* to allow
> removal protections only for offices that do not exercise "executive power,"
> Defendants then conclude that the NLRB does not fit within *Humphrey's Executor*.
> The necessary implication of such reasoning is that *no board or commission placed
> with the executive branch* could, as a constitutional matter, be legally subject to
> removal protections duly enacted by Congress.

775 F. Supp. 3d at 228 n.11 (internal quotations omitted) (emphasis in original).

## IV.    Plaintiff can bring an *ultra vires* cause of action.

Relying on the recent Supreme Court decision in *Nuclear Regulatory Commission v. Texas*,

145 S. Ct. 1762 (2025), the Government asserts that *ultra vires* causes of action are "highly

disfavored" and that Plaintiff cannot bring this claim. Brief at 32. *Ultra vires* claims are highly

disfavored in the specific context of *NRC* but that context—review of an agency action that falls

within specific statutory procedures for regulatory and judicial review—does not apply to this case.

In *NRC*, the State of Texas and a private company sought to challenge a decision of the

Nuclear Regulatory Commission (NRC) granting a private applicant a license to build and operate

an off-site spent nuclear fuel storage facility. The NRC denied the state's and company's petition

to intervene in the licensing proceeding. What they could have done, but failed to do, was seek

judicial review of the denial of intervention. Instead, they challenged the merits of the decision on

multiple grounds, including bringing a Hobbs Act claim and an *ultra vires* cause of action. *Id.* at

1772–75.

The Supreme Court's analysis of the case makes clear how inapposite it is here. First, the Court rejected the Hobbs Act claim because under that Act only parties are entitled to judicial review. *Id.* at 1772–75. The Court also noted that non-statutory *ultra vires* claims in the agency regulation context must be limited because otherwise "it could become an easy end-run around the limitations of the Hobbs Act and other judicial-review statutes." *Id*. at 1775. It further stated that *ultra vires* review was unavailable if aggrieved persons had a "meaningful and adequate opportunity for judicial review," or if a statutory review scheme foreclosed all other forms of judicial review." *Id.* at 1776. The Court then rejected the *ultra vires* claim for two reasons: (1) the parties had "basically dress[ed] up a typical statutory-authority argument as an ultra vires claim" and the statutory authority argument had previously been rejected; and (2) the parties had an "alternative path to judicial review" by challenging that the Commission's denial of intervention. *Id.*

A removal challenge like Plaintiff's here, which involves separation of powers issues, is far different than a challenge to an agency's regulatory decision. Unlike regulatory decisions, there are no preexisting administrative procedures or procedures for judicial review in this case, so there is no risk that permitting *ultra vires* claims will serve as an end run around those procedures. Indeed, in the recent removal cases, courts repeatedly approved *ultra vires* claims. *See Harper*, 2005 WL 2049207, at * 10 n.7; *Wilcox*, 775 F. Supp. 3d 215 (D.D.C. Mar 6, 2025); *Grundmann*, No. 25-425 (D.D.C. Feb. 14, 2025), ECF No. 1; *Boyle*, 2025 WL 1677099, at *3. None of the subsequent stay decisions in those cases have contravened that analysis. More fundamentally, whether plaintiffs use the phrase "*ultra vires*," or a different phrase like a "violation of separation of powers," the numerous cases cited in this brief demonstrate that it is a long-standing principle that a principal officer has a cause of action to challenge their removal.

36

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court deny the Government's Motion.

DATE:  July 28, 2025                    Respectfully submitted,


**/s/ Lisa J. Banks**


Victoria S. Nugent (D.C. Bar No. 470800)
Elena Goldstein (D.C. Bar No. 90034087)
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
vnugent@democracyforward.org
egoldstein@democracyforward.org

Lisa J. Banks (D.C. Bar No. 470948)
Carolyn L. Wheeler (D.C. Bar No. 1028645)
Bonnie L. Henry (D.C. Bar No. 1780382)
Marilyn Gabriela Robb (D.C. Bar No. 1686757)
**KATZ BANKS KUMIN LLP**
11 Dupont Circle, NW
Washington, D.C. 20036
(202) 299-1140
Banks@katzbanks.com
Wheeler@katzbanks.com
Henry@katzbanks.com
Robb@katzbanks.com

Jon M. Greenbaum (D.C. Bar No. 489887)
**JUSTICE LEGAL STRATEGIES PLLC**
P.O. Box 27015
Washington, D.C. 20038
(202) 601-8678
jgreenbaum@justicels.com

*Attorneys for Plaintiff Jocelyn Samuels*

**CERTIFICATE OF SERVICE**

I hereby certify that, on July 28, 2025, I caused the foregoing opposition to be filed with the Clerk of the Court for the United States District Court for the District of Columbia using the Court's CM/ECF system.  Participants in the case are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

July 28, 2025                    /s/ Lisa J. Banks
                                Lisa J. Banks (D.C. Bar No. 470948)
                                **KATZ BANKS KUMIN LLP**
                                11 Dupont Circle, NW
                                Washington, D.C. 20036
                                (202) 299-1140
                                Banks@katzbanks.com